In re MCKESSON HBOC, INC. SECURITIES LITIGATION

This Document Relates to All Actions No. C–9920743RMW.

United States District Court, N.D. California.

Sept. 28, 2000.

Leonard Barrack, Gerald J. Rodos, M. Richard Komins, Barrack, Rodos & Bacine, Philadelphia, PA, Max W. Berger, Daniel L. Berger, Rochelle Feder Hansen, Bernstein Litowitz Berger & Grossmann LLP, New York, NY, Co–Lead Counsel for Plaintiffs.

Moses Silverman, Thomas Gentile, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, Michael J. Shepard, Howard Caro, Heller Ehrman White & McAuliffe, San Francisco, CA, Counsel for Defendant Charles McCall.

Paul Renne, Cooley Godward LLP, San Francisco, CA, Dorothy Kirkley, Penn Payne, Kirkley & Payne, LLP, Atlanta, GA, Counsel for Defendant Albert J. Bergonzi.

Mark Stein, David Hennes, Fried, Frank, Harris, Shriver & Jacobson, New York, NY, James T. Fousekis, David Romanski, Rachel Boehm, Steinhart & Falconer, San Francisco, CA, Counsel for Defendant Mark A. Pulido.

John A. Reding, Grace A. Carter, Maria Graesser, Paul, Hastings, Janofsky & Walker LLP, San Francisco, CA, Counsel for Defendant Jay P. Gilbertson.

William Alderman, Orrick, Herrington & Sutcliffe, San Francisco, CA, Counsel for Defendant Richard H. Hawkins.

Tony Powers, Rogers & Hardin, Atlanta, GA, Counsel for Defendant Jay M. Lapine.

Samuel R. Miller, James Goldberg, Folger Levin & Kahn LLP, San Francisco, CA, Counsel for Defendants Alfred C. Eckert, Philip A. Incarnati, Alton F. Irby, M. Christine Jacobs, Gerald E. Mayo, James V. Napier, and Donald C. Wegmiller.

Melvin R. Goldman, Paul T. Friedman, Morrison & Foerster LLP, San Francisco, CA, Counsel for Defendants Mary F. Bitterman, Tully M. Friedman, John M. Pietruski, David S. Pottruck, Carl E. Reichardt, Alan Seelenfreund, Jane E. Shaw, and Robert H. Waterman.

James J. Binns, Philadelphia, PA, J. Philip Kirchner, Flaster, Greenberg, Wallenstein, Roderick, Spirgel, Zuckerman, Skinner & Kirchner, P.C., Cherry Hill, NJ, Counsel for Defendant Michael Smeraski.

Douglas R. Young, Farella Braun & Martel LLP, San Francisco, CA, Counsel for Defendant Heidi E. Hodowitz.

Jonathan J. Lerner, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, James E. Lyons, Timothy A. Miller, Skadden, Arps, Slate, Meagher & Flom LLP, San Francisco, CA, Counsel for Defendant McKesson HBOC, Inc.

Marshall Grossman, Gwyn Quillen, Alschuler, Grossman, Stein & Kahan, Los Angeles, Stan Roman, Tracy Clements, Krieg, Keller, Sloan, Rilley & Roman LLP, San Francisco, CA, Counsel for Defendant Arthur Andersen LLP.

Paul H. Dawes, Latham & Watkins LLP, Menlo Park, Jonathan M. Hoff, Dennis Block, Cadwaiader, Wickersham & Taft, New York, NY, Counsel For Defendant Bear Stearns & Co.

## ORDER RE MOTIONS TO DISMISS

WHYTE, District Judge.

Pending before the court are fourteen motions to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which were heard by the court on September 15, 2000. The court has read the moving and responding papers and heard the argument of counsel. The court's ruling is set forth in full at the end of this order.

## I. BACKGROUND

This is a securities class action lawsuit stemming from a dramatic decrease in the trading price of McKesson HBOC, Inc. ("McKesson HBOC") stock in April 1999.

### A. INFORMATION PUBLICLY AVAILABLE BEFORE THE FILING OF THE COMPLAINT

In October 1998, McKesson, Inc., a San Francisco-based company, announced that it would be acquiring HBO & Company ("HBOC"), a healthcare software company based in Atlanta, Georgia, through a merger.[1] The newly formed entity was to be named McKesson HBOC, Inc. On November 13, 1998, McKesson registered shares for McKesson HBOC, Inc. with the Securities Exchange Commission ("SEC"). These shares were to be issued to HBOC shareholders in the event that the merger was approved. As part of the registration process, McKesson filed a registration statement ("the McKesson November Reg-

---

1. The exact mechanics of the merger transaction are discussed below.

istration Statement"). The McKesson November Registration Statement included, among other things, data from HBOC's financial statements (some of which had been previously filed by HBOC with the SEC). The McKesson November Registration Statement also disclosed that holders of HBOC common stock would receive 0.37 shares of newly-issued McKesson HBOC stock for each share of HBOC stock.

The acquisition of HBOC required approval from the shareholders of both companies. On November 27, 1998, the two companies solicited proxies through a joint proxy statement and prospectus ("the Joint Prospectus"). The Joint Prospectus contained the same HBOC financial data reported in the McKesson November Registration Statement.

Both companies' shareholders approved the merger, which was accomplished on January 12, 1999. That same day, McKesson was renamed McKesson HBOC, Inc. HBOC became McKesson HBOC's Healthcare Information Technology Business Unit ("the ITBU"), a wholly owned subsidiary of McKesson HBOC. On the day of the merger, McKesson HBOC stock traded for as much as $89½ per share.

Barely four months later, on April 27, 1999, McKesson HBOC issued a press release in which it announced the company's discovery of more than $42 million in improperly recognized revenue, which would have to be reversed. The improperly recognized sales were in fact contingent transactions. The improperly recognized sales all came from HBOC and the ITBU. The company warned that it was continuing a financial audit, and warned of the "possibility that additional contingent sales may be identified." (Compl.¶ 41.)

The market reacted swiftly to this disclosure. Within 24 hours, the trading price of McKesson HBOC stock had dropped from the previous day's close of $65.75 to a closing price of $34.50. This drop represented a $9 billion drop in market capitalization.

On May 25, 1999, McKesson HBOC issued a further press release, which updated the market on the status of the HBOC/ITBU audit. According to the press release, "additional instances of improper revenue recognition have been found." (Compl.¶ 43.) The press release promised that the company would conclude the investigation and issue corrected financials in the near future.

Less than a month later, and before it had issued corrected financials, the company announced that several former HBOC executives were being terminated for their participation in the HBOC/ITBU accounting improprieties. Specifically, the company announced that McKesson HBOC Chairman Charles W. McCall "has been removed as Chairman of the Board and dismissed as an employee" and that four other ITBU officers—including defendants Bergonzi, Lapine and Smeraski—had "been dismissed immediately for cause." (Compl.¶ 170a.) In subsequent communications with the press, McKesson HBOC officials (including the company's newly appointed Chairman and its official spokesperson) discussed the ongoing HBOC/ITBU audit. According to these officials, HBOC/ITBU senior management had been intentionally (and secretively) booking contingent software transactions as sales for several years. (Compl.¶¶ 170b-f.)

Finally, on July 14, 1999, McKesson HBOC issued a press release announcing the results of its audit. The audit had uncovered more than $327 million in improperly recorded transactions, of which at least $50 million were never likely to become properly recognizable sales. (Id. ¶ 45.) The company's restated financials were filed with the SEC on July 16, 1999.

Not surprisingly, several dozen shareholders' lawsuits had meanwhile been filed. Named defendants included McKesson HBOC, the ITBU, directors and executives of the corporations involved in the merger, and the accounting firm and investment bank that failed to undercover the alleged accounting fraud.

The various class actions alleging violations of federal securities law have been consolidated in this court, and the New York State Common Retirement Fund has been appointed Lead Plaintiff for those actions.

On February 25, 2000, Lead Plaintiff filed an Amended and Consolidated Class Action Complaint ("the Complaint"). The Complaint alleges sixteen causes of actions against almost all possible defendants (with the notable exception of HBOC /ITBU, which has been sued by Lead Plaintiff in a separate complaint). The Complaint provides the specifics of the restated financial data and also details McKesson HBOC's public statements about the accounting improprieties.

## B. INVESTIGATIVE FINDINGS SUMMARIZED IN THE AMENDED AND CONSOLIDATED CLASS COMPLAINT

In addition, the Complaint summarizes the results of lead counsel's investigation into the HBOC/ITBU accounting irregularities, as well as investigative reporting in the *Wall Street Journal* about the alleged accounting fraud.

### 1. *Lead Counsel's Investigation*

The Complaint identifies 15 HBOC employees and customers who cooperated with lead counsel's investigation. They are identified by job title, but not by name.

The sources implicate several of the named defendants in HBOC's apparently widespread practice of accompanying contracts with side letters that revealed contingencies not disclosed on the face of the contract. (Compl.¶ 181–182.) The sources state that the side letters were often stored separately from the contracts. The complaint recounts several witnesses' statements implicating several defendants in the improper recognition of those contingent sales as revenue. According to the relevant section of the complaint:

> 183. Independent sources told plaintiffs' investigators that while defendant Gilbertson had the final say as to whether and when revenue would be recognized on a given contract, including those that were subject to contingencies and "side letters," or knew of the decision, such decisions were collaborative efforts among defendants McCall, Bergonzi, Gilbertson and Lapine.

> a. A Senior Vice President ("Sr. V.P.1"), a Regional Vice President who came to HBOC when it merged with AMYSIS, and a former sales representative ("Sales Rep. 2") confirmed that ultimate responsibility for recognizing revenue lay with defendant Gilbertson, but that decisions were made in collaboration with defendant Bergonzi and others, including DeRosa and Glen Rosenkoetter, an assistant Vice President. This collaboration was confirmed by another Senior Vice President ("Sr.V.P.2") and Regional V.P. 3. According to Sales Rep. 2, defendant Gilbertson stated that he had final authority on revenue recognition in conference calls with Sales Rep. 2 and the Regional Vice President regarding a large contract they were negotiating, which contained contingencies.

> b. Sales V.P. 1, Regional V.P. 1 and Sr. V.P. 2 identified defendants McCall, Bergonzi and Gilbertson as being involved in making decisions on whether to book revenue from particular transactions. Sales V.P. 1 said it was common knowledge among HBOC salesmen and management that both McCall and Bergonzi knew of and actively encouraged the posting of contingent, consignment and even purely *fictitious* sales as current revenue. According to this individual, McCall and Bergonzi made the decisions to book revenue on contingent transactions, including sales with "board approval amendment" contingencies (i.e., proposed deals which required, but had not yet received, approval of the purchaser's board of directors).

c. Sales V.P. 2 was personally involved in negotiating the detailed terms of numerous major contracts and was in a position to know the precise status of such contract negotiations. According to Sales V.P. No. 2, and based on his firsthand knowledge, Bergonzi, Gilbertson and Lapine, as well as Dominick DeRosa, former HBOC National Sales Director, knew that HBOC was booking contingent sales as immediate revenue, and Bergonzi participated in the decisions to book revenue on contingent transactions.

d. Contracts were kept outside of normal channels, for among other reasons, to avoid having to pay commissions to sales representatives and vice presidents. According to a former HBOC product manager ("Product Manager") and a former HBOC regional sales vice president ("Regional V.P. 3"), decisions as to whether to recognize revenue and whether to pay commissions on particular contracts were made by, among others, defendants Bergonzi and Gilbertson.

e. According to Sales V.P. 2, many of HBOC's major sales contracts were contingent in nature and provided for delivery of the products supposedly "sold" over periods as long as two years. Thus, for example, HBOC booked revenues on deals with Quorum in 1994 (a deal in which Sales V.P. 2 was actively involved) and with Beverly Enterprises in 1997 (a deal handled by another Vice President of Sales), despite the wholly contingent nature of these "sales." Bergonzi, Gilbertson and DeRosa decided to book revenue in the Quorum deal at a time when the contract was months away from being signed.

f. According to Sales V.P. 1., Bergonzi also personally negotiated on HBOC's behalf with the Chief Information Officer of Baptist Hospital, Memphis, Tennessee. This contract for an Enterprise Solutions System was signed on December 31, 1997.

HBOC booked current revenue in 1997 from the deal negotiated by Bergonzi, even though the contract did not provide for immediate delivery of any product, but rather contemplated an ongoing production of systems and support services over more than one year. Indeed, some of the software supposedly sold to Baptist Hospital was never installed by HBOC.

184. Notwithstanding the fact that certain employees objected to the revenue recognition practices at HBOC, defendants continued to improperly recognize revenue.

a. According to Sales V.P. 1, after DeRosa left HBOC in the Fall of 1998 and was replaced by defendant Smeraski, McCall and Bergonzi personally thwarted an attempt by Smeraski to "bring some sanity into what they were selling or not selling." i.e., to ensure that only truly final sales were reported as generating sales revenue. Shortly after replacing DeRosa, Smeraski learned of the improper accounting underlying HBOC's reported sales revenues, and told the sales force, including Sales V.P. 1, that the sales numbers reported by HBOC were "not real." He further told the HBOC sales force, including Sales V.P. 1, that they would not be able to "make their numbers," i.e., their sales quotas, because he would not condone the continuation of the improper sales practices (e.g., the creation of secret side letters, the backdating of contracts, etc.) needed to support the accounting fraud. Shortly thereafter, however, McCall, Bergonzi and Gilbertson forced Smeraski to permit these improper practices to continue and directed him to make sure that the sales force continued to "make their numbers." Rather than resign his position, or even expose these improprieties., Smeraski willfully acceded to and actively participated in HBOC's wrongful accounting practices.

b. In January and February 1999, after the close of the fourth quarter of 1998, Area V.P. learned that revenues had been booked from several contracts that he personally knew contained unsatisfied contingencies, which Area V.P. believed would ultimately fail to be satisfied. These included the St. Vincent's Infirmary in Little Rock, Arkansas and Riverside Hospital in Wichita, Kansas, contracts discussed below. He recommended to defendants Bergonzi and Smeraski that these deals be "debooked" because of the probability that the contingencies would not be satisfied. These recommendations were ignored.

(Compl. ¶¶ 183–184.)

2. *The Wall Street Journal Article*

On July 15, 1999, the *Wall Street Journal* published a lengthy article detailing its own investigation of the financial irregularities at HBOC. The portions excerpted in the complaint state:

In one case, a former HBO salesman says, his managers shipped and booked a $200,000 software upgrade even though his customer, a Los Angeles hospital, had merely agreed to consider buying it later. Others say that HBO executives sometimes encouraged salespeople to backdate contracts by up to a week so as to include the sale in a quarter that had just ended. A person close to the investigation doesn't dispute this account.

Deloitte [ & Touche, the Company's outside auditors,] staffers had taken the routine step of sending letters to HBO customers to verify that contracts were as recorded. A junior auditor was surprised to hear back from a computer customer that its $20 million software purchase hadn't, in fact, gone through and had been backdated. Soon, several smaller contracts turned out to be contingent on unmet conditions.

[The McKesson HBOC audit committee] formed a review team including lawyers from Skadden, Arps, Slate, Meagher & Flom and dozens of forensic accountants from PricewaterhouseCoopers, skilled at reconstructing computer records. The committee told the team to do a second audit, independent of Deloitte, and meet with Justice Department and SEC officials.

As the team grilled 36 HBO staffers, they turned up more and more cases of contracts that included "side letters" stating conditions that had to be met for sales to go through. The letters were stashed away in various places, but always kept separate from the contract files presented to outsiders. They cited contingencies ranging from board approval to the arrangement of financing.

\* \* \* \* \* \*

[S]oon the review team uncovered explosive new evidence, people close to the inquiry say. They managed to access hard-disk files previously deleted. These "dark files," as investigators call them, provided clues, including schedules, memos, codes—and the secret list of contracts with references to contingencies that hadn't been met. They also helped identify backdated contracts.

\* \* \* \* \* \*

After further interviews at HBO headquarters in Atlanta, the team concluded that at least four HBO officials had participated in an organized approach to accelerating the recognition of revenue, says someone close to the inquiry.

\* \* \* \* \* \*

In one case, a Southern California hospital had all but signed off on a big purchase from HBO when a large chain agreed to acquire the institution. That scotched the deal, says the former HBO salesman on the account. HBO booked it anyway, he says, adding, "I told them the deal wasn't going to close. They told me, 'We're still going to ship.' That's how they booked revenue and invoiced the sale." A person close to the investigation calls this account consistent with its findings.

**1257**

In software accounting, a signed contract often doesn't amount to a sale. The goods must leave the company's shipping dock. "It was common knowledge that if you thought you would get the order, and it was close to end of quarter, then you'd tell them to ship the software," says Richard Varlyan, a former HBO salesman in Canada. "All they wanted was a receipt from the hospital that it arrived." Making this booking of sales even dicier was the fact that this complex software is essentially useless until an HBO technician has laboriously installed it.

One Los Angeles hospital agreed to sign a contingent contract in July 1997. But its chief information officer, or CIO, says he had no intention of buying the product. The side letter stated that he had no obligation; it merely committed HBO to sell the product at a set price for up to a year. Yet a year later, a boxload of the software landed in the CIO's office.

"We called them up and said, 'Hey, we didn't buy this. Don't bill us,'" the CIO says. The salesman reappeared and tried to get him to extend the deal for another year, the CIO says. "I said, 'No way.'"

Such a pattern came quickly into focus after the "dark files" discovery.

McKesson's audit committee took its findings to the full board on June 18 [,1999], with recommendations to retain or not retain certain people. The board formed a committee of outside directors to consider the proposal, and it decided on the dismissals.

(Compl.¶ 177.)

## II. LEGAL STANDARD

Rule 8(a) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." As a result, motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are typically disfavored; complaints are construed liberally to set forth some basis for relief, as long as they provide basic notice to the defendants of the charges against them.

While the Rule 8 notice pleading standard is the general rule, the more specific provisions of Rule 9(b) apply to "all averments of fraud or mistake." In such cases, "the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). This requires pleading of two types of information: (1) the "time, place, and content of alleged misrepresentation" (the "neutral facts necessary to identify the transaction"); and (2) "an explanation as to why the statement or omission complained of was false or misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 (9th Cir.1994) (en banc).

The Private Securities Litigation Reform Act of 1995 ("PSLRA" or "the Reform Act") tightens these requirements even further for securities fraud allegations. Most importantly, the Reform Act requires particularized pleading of scienter: "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(a). The Ninth Circuit recently interpreted this statutory provision in *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970 (9th Cir.1999). The *Silicon Graphics* court held that "a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct .... [Averment of particular facts giving rise to a strong inference of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading standard under the PSLRA]." 183 F.3d at 974. A "strong inference" is to be distinguished from "a mere speculative inference ... or even a reasonable inference." *Id.* at 985.

## III. ANALYSIS

The first nine counts of the complaint raise claims under Sections 11 and 15 of

the Securities Act of 1933; the next six counts raise claims under Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934; and the final count of the complaint raises a claim of breach of fiduciary duty against McKesson's officers. The court addresses the viability and adequacy of the pleading of each claim.

### A. SECTION 11 CLAIMS

Section 11 of the Securities Act of 1933 creates civil liabilities for persons who issue registered securities pursuant to false registration statements. Section 11 provides:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—
>
> (1) every person who signed the registration statement;
>
> (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
>
> (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;
>
> (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;
>
> (5) every underwriter with respect to such security.

15 U.S.C. § 77k(a). Culpable conduct is not an element of a Section 11 claim. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). However, the statute provides a number of affirmative defenses for defendants (other than the issuer), including reasonable reliance on expert or governmental reports and lack of damages to plaintiffs. *See* 15 U.S.C. § 77k(b), (c), (e).

Lead Plaintiff has filed Section 11 claims against virtually every corporate and individual defendant. The Section 11 allegations can be divided into two basic groups:

(1) claims based on McKesson's republication of HBOC's false financial data in the November Registration Statement, brought by those HBOC shareholders who were issued McKesson HBOC, Inc. stock pursuant to the November Registration Statement during the merger ("the HBOC shareholders"); and

(2) claims based on HBOC's publication of false financial data in a series of registration statements for HBOC stock issued in exchange for stock of several companies acquired by HBOC before it was itself acquired by McKesson, brought by shareholders of the acquired companies ("the early exchangers").

Defendants move to dismiss both sets of allegations.

### 1. *The Former HBOC Shareholders and the November Registration Statement*

Defendants argue that the former HBOC shareholders fail to state a claim with regard to McKesson's financial statement because the false HBOC financial data in the November Registration Statement was immaterial to HBOC shareholders in deciding whether to purchase McKesson stock. Defendants also argue that the complaint reveals a lack of damages suffered by former HBOC shareholders. Certain Section 11 defendants also

allege that the claims are insufficiently particular and that the complaint pleads facts showing that they are entitled to an affirmative defense of expert reliance. For its part, Arthur Andersen argues that it should be dismissed as a Section 11 defendant because the April corrective disclosure did not reveal any improprieties relating to Arthur Andersen's audit of HBOC. The court addresses only the materiality argument, because it is the only necessary ground for dismissing all Section 11 claims grounded in the McKesson November Registration Statement.

■ Like all provisions of the 1933 and 1934 Acts, Section 11 penalizes only statements that are materially false. The proponent of an omission or statement's materiality must show

> a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact [or correction of the misstated fact] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). In the context of a share exchange, an omitted or misstated fact "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.*

Lead Plaintiff argues that the formulation of materiality in *TSC Industries* (quoted above) merely requires that the information be an important part of the "total mix of information made available," and that basic information about HBOC's financials clearly falls into this category. Lead Plaintiff also argues that the *TSC Industries* Court did not require that a misstatement or omission be outcome-determinative, as long as it would be important to the investor's decision. Citing a number of cases, Lead Plaintiff argues

that a company's financial statements are always important information for investors to consider. *See, e.g., SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir.1980).

Defendants argue to the contrary, relying principally on *Elfenbein v. American Financial Corp.*, 487 F.Supp. 619 (S.D.N.Y.1980), *aff'd*, 652 F.2d 53 (2d Cir. 1981) (unpublished table decision). In *Elfenbein*, the defendant, American Financial Corporation, contracted with shareholders of National General Corporation to effect a merger of the two companies. After the merger was completed, shareholders of National (the company being purchased) discovered that registration statements issued by Financial (the purchasing company) failed to disclose that National had a tax liability of $80,000,000. A shareholders' suit ensued. The court rejected the National shareholders' argument that the omission was material:

> The court finds that the failure to disclose the purpose of the loan-warrant transaction is immaterial. Disclosure of a possible tax liability would not have influenced a reasonable shareholder to seek appraisal rather than accept the merger proposal since a contingent liability in the magnitude of $80,000,000 would have substantially depreciated the value of National's shares and have been an inducement to the stockholders to elect to accept the terms of the merger which provided for an exchange of National shares for Financial's 9½% debentures. In short, the non-disclosure of National's possible tax liability was not a causal link which induced the National shareholders to accept the merger terms.

487 F.Supp. at 627 (citation omitted). The court accordingly dismissed the National shareholders' Section 11 claim for failure to plead a material misstatement.

More recently, in *Minzer v. Keegan*, 218 F.3d 144 (2d Cir.2000), the Second Circuit affirmed the dismissal of a complaint brought by investors who alleged that a company had failed to disclose in a proxy

solicitation all the details of a merger offer from another company. While recognizing that the information was material in the sense that it was "important" information, the Second Circuit held that the investors failed to state a claim because

> in the proxy context this definition of materiality [the *TSC Industries* definition] assumes that the omitted information would have influenced a reasonable shareholder against the proposed transaction for which proxies were sought. Here, the omitted information would not have made a reasonable shareholder any less likely to favor the objected-to transactions, and such an omission, material or not, could not have caused the injury for which damages are sought.

*Minzer*, 218 F.3d at 149. On the facts alleged in the complaint, the *Minzer* court noted that the merger with the other company would have been less attractive than the merger that the shareholders were induced to approve. Accordingly, there was "no sense in which the omitted information, if available, would have diminished a reasonable shareholder's favorable view of the merger [that was proposed and approved]." *Id.* at 150–51.

Neither *Elfenbein* nor *Minzer* provides a full explanation for its reasoning, but the court believes that the result is a sound one. In the common law of fraud, materiality is intimately bound up with the concept of reliance. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* [hereinafter *Prosser and Keeton*] § 108 (5th ed.1984) (discussing materiality as a component of justifiable reliance). Reliance, in turn, is linked to causation. *See Restatement (Second) of Torts* § 546 (1977). Although few cases directly address the issue, it is implicit in many other definitions of materiality that a misrepresentation or omission is material only if it induces (or at least tends to induce) reliance. For instance, an influential early S.E.C. decision defines a material fact as one "which if it had been correctly stated or disclosed would have deterred or tended to deter the average prudent investor from purchasing the securities in question."

*Escott v. BarChris Constr. Corp.*, 283 F.Supp. 643, 681 (S.D.N.Y.1968) (quoting *Charles A. Howard*, 1 S.E.C. 6, 8 (1934)); *accord In re Keegan Management Co. Sec. Litig.*, 794 F.Supp. 939, 944 (N.D.Cal. 1992). Even before *Minzer*, the Second Circuit held that omitted information is material if it "might have induced shareholders to vote *against* the merger." *Mendell v. Greenberg*, 927 F.2d 667, 675 (2d Cir.1990) (emphasis added), *modified on other grounds*, 938 F.2d 1529 (2d Cir. 1991). Similarly, the American Law Institute states, with regard to fraud in the inducement of a contract: "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." *Restatement (Second) of Contracts* § 162(2) (1981). Under these definitions, a misstatement or omission cannot be material if its correction or disclosure would only redouble the plaintiff's resolve to enter into the proposed transaction.

■ To be sure, under *TSC Industries*, a false statement does not have to be "outcome-determinative" to be material. However, this means simply that the misrepresentation or omission does not have to be the "but for" inducement for assent to the transaction. A statement must still be at least outcome *relevant* to be actionable under the securities laws. Lead Plaintiff is correct that numerous cases appear to adopt a *per se* rule that misstated financial information is material, but these cases relate without exception to suppressed "negative" information. *See, e.g., Murphy*, 626 F.2d at 653 (holding that failure to disclose issuer's losses to purchasers was a material omission). Thus, the court finds that those authorities are not apposite, because they do not contemplate the scenario where the issuer is hiding "positive" facts from the purchaser.

■ In light of the foregoing discussion, McKesson's alleged misstatements about HBOC's accounts could not have been material in the context of the McKesson No-

vember Registration Statement. The stock issued under the McKesson November Registration Statement was intended solely for HBOC shareholders who would exchange their shares of HBOC shares if the merger was approved.[2] If the true facts were disclosed prior to the merger, the market presumably would have acted rationally and discounted the shares to correct the previous inflation. At that point, HBOC shareholders could have sold their shares into a depressed market, or they could have approved the merger, which because of its fixed exchange ratio, would only be more favorable with each drop in HBOC's trading price. There is simply not a substantial likelihood that a reasonable investor would have difficulty deciding which course of action to take. The misstatements were therefore immaterial.

To hold otherwise would allow HBOC shareholders to state a claim for McKesson's failure to tell HBOC shareholders that their own shares of HBOC were inflated due to accounting fraud. Put even less sympathetically, such a lawsuit would be premised in McKesson's failure to tell the HBOC shareholders that they were getting too good a deal in the merger. This would be no different than allowing a home buyer to sue the seller for fraud when the seller had said the home was only worth $50,000—and had sold it at that price—when it was actually worth $500,000, because the value of a house is "important" information. Neither logic nor precedent compels such a result. While indisputably "important" financial information, the true facts about HBOC's finances would not have made a reasonable HBOC shareholder less likely to approve the merger. To paraphrase *Elfenbein*, disclosure of the true facts "would have substantially depreciated the value of [HBOC]'s shares and have been an induce-

ment to the stockholders to elect to accept the terms of the merger." 487 F.Supp. at 627.

Because the misstatements in the McKesson November Registration Statement were immaterial as a matter of law, the court need not reach various defendants' other arguments for dismissal of the HBOC shareholders' claims.

## 2. *The Early Exchangers*

■ Although the HBOC shareholders who exchanged their shares of HBOC for McKesson did not acquire McKesson stock pursuant to a materially false registration statement, some HBOC shareholders had earlier acquired their HBOC shares pursuant to registration statements containing the allegedly false financial data. These data would unquestionably be material to those shareholders, who acquired HBOC stock in exchange for shares they held in companies that HBOC acquired. If these "early exchangers" had known that HBOC was engaged in dubious accounting practices, they doubtlessly would have reevaluated their decision to acquire HBOC shares. (There is no allegation that any of these acquired companies were affected by accounting fraud prior to their acquisition by HBOC.)

However, a plain reading of the statute and relevant SEC regulations precludes any of these early exchangers from recovering under Section 11. Section 11 provides an exact measure of damages: "the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought [or] (2) the price at which such security shall have been disposed of in the market before suit . . . . ." 15 U.S.C. § 77k(e).

---

**2.** Lead Plaintiff argues that this is not a Section 14 claim, and that it is therefore not required to show that the information could have had an effect on HBOC shareholders' vote for the merger. What this argument fails to recognize is that there was only one way in

which HBOC shareholders could acquire the stock issued pursuant to the Registration Statement—by approving the merger. The question of how HBOC shareholders would have voted if armed with the true facts is therefore the only relevant inquiry.

In this case, all the early exchangers are barred from stating a claim under Section 11. SEC Rule 145 defines as a "sale" for purposes of the 1933 Act:

> *Mergers or Consolidations.* A statutory merger or consolidation or similar plan or acquisition in which securities of such corporation or other person held by such security holders will become or be exchanged for securities of any person, unless the sole purpose of the transaction is to change an issuer's domicile solely within the United States . . . .

17 C.F.R. § 230.145(a)(2).[3] Under this rule, the early exchangers no longer held HBOC shares at the time of suit, because they had been "sold" during the exchange. Thus, the Section 11(e)(1) measure of damages, based on value at the time of suit, is unavailable to the early exchangers—or to any other HBOC shareholder for that matter.

■ Furthermore, the Section 11(e)(2) measure of damages is unavailable to the early exchangers. There is no allegation in the complaint that any corrective disclosures reached the market prior to April 1999. Thus, the complaint reveals that the Section 11 defendants have an absolute "negative causation" defense pursuant to Section 11(e) for any HBOC shareholders who disposed of their shares prior to the corrective disclosure. Moreover, all HBOC shareholders who participated in the McKesson merger "sold" (as that term is defined in SEC Rule 145) their shares at a price higher than the price they paid. (The parties do not dispute that the trading price of HBOC on the day of the McKesson–HBOC merger was higher than the trading price of HBOC on the effective dates of any of the previous HBOC mergers, taking into account intervening stock splits.) Shareholders who sell their stock at a price higher than their purchase price are entitled to no relief under Section 11, because all measures of damages under Section 11 are limited to differences in trading price. *See PPM Am., Inc. v. Marriott Corp.*, 853 F.Supp. 860, 875–78 (D.Md.1994).

The court accordingly dismisses the Section 11 claims of the early exchangers as well. Combined with the dismissal of the Section 11 claims for HBOC shareholders who participated in the McKesson merger, this results in the dismissal of the first nine counts of the complaint in their entirety.

## B. SECTION 14(A)/RULE 14A–9 CLAIMS

Section 14 of the Securities Exchange Act of 1934 regulates the solicitation of proxies with respect to any security registered under the Act. SEC Rule 14a–9(a), which was promulgated under Section 14(a), provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

**3.** Prior to the enactment of Rule 145 and the Supreme Court's decision in *SEC v. National Sec., Inc.*, 393 U.S. 453, 469, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the SEC followed a "no sale" rule for all stock-for-stock exchanges, which meant that there was no liability under Section 11 or any other provisions of the federal securities laws in the context of a stock-for-stock exchange. As a general matter then, Rule 145 is a pro-shareholder rule.

*See* 17 C.F.R. § 230.145 (preliminary note) ("Rule 145 . . . is designed to make available the protection provided by registration under the Securities Act of 1933, as amended . . . , to persons who are offered securities in a business combination of the type described in paragraphs (a)(1), (2) and (3) of the rule."). Its operation in this particular case, however, does bar recovery on the asserted Section 11 claims.

17 C.F.R. § 240.14a–9. Counts X, XI, and XII of the Complaint allege Section 14 claims brought by McKesson shareholders who held stock on the date of the Joint Proxy Statement who held their shares through the merger on January 12, 1999. They allege that they were misled into approving the merger by false statements about HBOC's financial data contained in the Joint Proxy Statement.

1. *Required State of Mind for Section 14(a) Claims*

■ Defendants argue that the appropriate standard of culpability under Rule 14a–9 is scienter, while Lead Plaintiff argues for a lower negligence standard.

Lead Plaintiff's position is correct. The language of Rule 14a–9 lacks any reference to a "manipulative or deceptive device or contrivance," the language used in Section 10(b) of the 1934 Act to indicate a requirement of scienter. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (relying on Section 10(b)'s use of the words "manipulative," "deceptive," and "contrivance" to imply a scienter requirement). In a case construing Section 17(a) of the 1934 Act, the Supreme Court analyzed virtually identical language as that in Rule 14a–9 and held that a simple prohibition of false or misleading statements of material fact does not imply any requirement of scienter. *See Aaron v. SEC*, 446 U.S. 680, 696, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) (construing disjunctive language in Section 17(a) of the '33 Act to reach both intentional and unintentional conduct).

Based in large part on such textual analysis, the weight of authority rejects a scienter standard for claims under Section 14. *See, e.g., Gerstle v. Gamble–Skogmo, Inc.*, 478 F.2d 1281 (2d Cir.1973) (Friendly, J.) (noting differences between Sections 10(b) and 14(a) of the 1934 Act and construing Section 14(a) to cover negligent misstatements); *see also* 4 Louis Loss & Joel Seligman, *Securities Regulation* 2082–2084 (3d ed. 1990 & Supp.1999) (collecting cases). Indeed, with respect to defendants who directly solicited proxies, it appears that no reported opinion requires plaintiff to plead or prove scienter.

■ With regard to outside professionals such as accountants and financial advisers, the authority is only slightly less uniform. In *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422 (6th Cir.1980), the Sixth Circuit held that a scienter standard should be applied to outside accountants in a Section 14(a) action. At least one court in this Circuit has agreed. *See Zatkin v. Primuth*, 551 F.Supp. 39, 45 (S.D.Cal. 1982).

The *Adams* court adopted a scienter standard for Section 14(a) claims against outside accountants because accountants do not owe fiduciary duties to shareholders and because they might be penalized even for "minor mistakes" if a negligence standard were adopted. The court also noted that the legislative history of Section 14 contains several discussions of Congress' desire to penalize "unscrupulous" and "dishonest" behavior.

*Adams* has been rejected by the only other Court of Appeals to consider the issue, *see Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 190 (3d Cir.1988), and has not met with approval from commentators either. *See* 3E Harold S. Bloomenthal & Samuel Wolff, *Securities and Federal Corporate Law* § 24:63, at 24–121 (2000) (criticizing *Adams* for a "cavalier attitude" toward the professional responsibilities of outside auditors and predicting that the decision "is not likely to be followed by discerning courts.")

The court believes that the critics of *Adams* have the better argument. As the *Herskowitz* court stated:

since an investment banker rendering a fairness opinion in connection with a leveraged buyout knows full well that it will be used to solicit shareholder approval, and is well paid for the service it performs, we see no convincing reason for not holding it to the same standard of liability as the management it is assisting.

857 F.2d at 190. Moreover, the *Adams* court's concerns about holding outside auditors liable for minor mistakes seems misplaced, because even under a negligence standard plaintiffs only prevail if they prove that the misstatements were material and that the defendants deviated from an appropriate standard of care. Finally, although Congress may have focused on intentional misconduct when it debated Section 14, the statute as enacted casts a wider net, as discussed above. *See J.I. Case Co. v. Borak,* 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (stating that "purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive *or inadequate* disclosure in proxy solicitation." (emphasis added)).

■ Similarly, the court sees no reason to hold non-management or "outside" directors to a lesser standard of responsibility under Section 14(a). Courts that have expressly considered the liability of outside directors have concluded that they should be held to the same standard of due care as management directors. *See Gould v. American–Hawaiian S.S. Co.,* 535 F.2d 761, 777–78 (3d Cir.1976) (noting that "outside" directors owe same fiduciary duties of care to shareholders as other directors and holding them to a negligence standard); *accord In re Cendant Corp. Litig.,* 60 F.Supp.2d 354, 377 (D.N.J.1999). Moreover, comparison with Section 11 of the Securities Act reveals that, when it desired to, Congress expressly insulated outside directors from the full brunt of the securities laws. *See* 15 U.S.C. § 77k(f)(2)(A) (enacted 1995) (limiting joint and several liability of outside directors under Section 11). It is certainly not unreasonable to hold outside directors to a standard of due care when lending their names to proxy solicitations.[4]

The court accordingly holds that all persons liable under Section 14 should be held to the same standard of culpability: negligence.

2. *Falsity of Bear Stearns' Fairness Opinion*

■ The Joint Proxy Statement contains a statement from Bear Stearns that the Exchange Ratio adopted for the merger was "fair, from a financial point of view, to the shareholders of McKesson." (Compl.¶ 25.) According to the Complaint, "[t]his statement was false because HBOC's revenue, earnings and assets had been improperly stated, as alleged herein." (Compl.¶ 155.)

Bear Stearns argues that this allegation of falsity is insufficient, because Lead Plaintiff does not plead that the statement of opinion was "knowingly false or misleadingly incomplete." Bear Stearns relies principally on *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), which held actionable a statement from a corporation's board of directors that it was approving a merger "because it provides an opportunity … to achieve a high value for [public] shares," but only if plaintiffs could prove that the statement was knowingly false. *Id.* at 1090, 111 S.Ct. 2749 (emphasis added). According to Bear Stearns, *Virginia Bankshares* in effect creates a scienter standard for all statements of opinion.

*Virginia Bankshares* is not squarely on point, because it dealt with a statement of subjective motivation, that is, the board's statement that it was undertaking a course of action because it believed certain things to be true. Such a statement is literally false, of course, only if the speaker is not truly acting for his stated reasons. In such a case, an inquiry into subjective falsity is necessary. The court notes the excellent discussion of the problem in *Freedman v. Value Health, Inc.,* 958 F.Supp. 745 (D.Conn.1997), a post-*Virgi-*

---

4. The outside director defendants suggest that a scienter standard should be applied to them because they reasonably relied on Arthur Andersen's and Bear Stearns's accounting and due diligence efforts. This of course is a factual issue that cannot be resolved on the pleadings. In any event, even a negligence standard would still protect outside directors who were reasonably diligent in approving a proxy solicitation.

*nia Bankshares* case that considered whether a professionally rendered fairness opinion was actionable:

> As the Supreme Court has observed, a statement of opinion may be a material statement of fact in two senses: 1) as a statement of subjective fact (e.g., the directors *believe* the merger is fair), and 2) as a statement of objective fact (e.g., the merger *is* fair).

958 F.Supp. at 752 (emphases in original). The *Freedman* court noted that the Supreme Court in *Virginia Bankshares* had only considered whether a statement of reason ("We are taking step Y *because we believe* X") could be actionable if it was objectively true but subjectively false. *Virginia Bankshares* answered that question in the negative, but did not address the question presented here: whether a statement of opinion can be actionable if it is objectively false even if subjectively true.

The *Freedman* court did address the issue, and concluded that a fairness opinion could be actionable only if was not sincerely believed, even if it was objectively unreasonable. The court appeared to be concerned principally by the risk of holding defendants liable for good-faith, if negligent, mistakes. *See id.* at 752–53. The court also noted that the Supreme Court's discussion in *Virginia Bankshares* of both an objective and subjective showing of falsity would be unnecessary if an opinion could be actionable simply for being objectively unreasonable. *See id.* at 753.

The issue is a close one, but the court believes that the result in *Freedman* is correct. The court does not agree with the *Freedman* court that a negligence standard for professional opinions is necessarily unfair—as noted earlier, even a negligence standard protects outside professionals who make immaterial mistakes or who have made material mistakes despite exercising due care. Particularly in the context of a proxy solicitation, it is not unreasonable to hold a professional investment bank to a standard of reasonable care in issuing a fairness opinion that will be relied upon by a company's shareholders.

However, the other reason stated in *Freedman*—that the Supreme Court implicitly held that a statement of opinion must be *both* objectively and subjectively false—is persuasive. A fairness "opinion" is just that—an opinion. Rule 14a–9 prohibits only statements that are "false." The teaching of *Virginia Bankshares* is that an opinion is only false if the speaker does not in fact hold that opinion. Thus, the securities laws do not create a general cause of action for negligence by investment advisers [5]—they only reach false statements made by those investment advisers. While material statements of fact are false if they are contradicted by true facts, material statements of opinion are false only if the opinion was not sincerely held. This is the teaching of *Virginia Bankshares*. In the case of a fairness opinion, then, the plaintiff must plead with particularity why the statement of opinion was objectively *and* subjectively false.[6]

 Thus, the court holds that Lead Plaintiff has failed to state a Section 14 claim against Bear Stearns because it has not pleaded with particularity why the fairness opinion was knowingly false.[7] (Of

---

5. State courts have recognized such a cause of action, at least in limited circumstances. *See, e.g. Wells v. Shearson Lehman/American Express, Inc.*, 127 A.D.2d 200, 514 N.Y.S.2d 1 (N.Y.A.D.1987), *rev'd on other grounds*, 72 N.Y.2d 11, 530 N.Y.S.2d 517, 526 N.E.2d 8 (1988). However, what such suits attack is not the falsity of a given fairness opinion, but the unreasonable conduct of the investment adviser in reaching that opinion.

6. The court recognizes that a fairness opinion issued by an investment professional is a far cry from the typical vague statement of optimism that is not actionable absent proof of knowing falsity under *Virginia Bankshares*. *See* 4 Loss & Seligman, *supra,* at 122–24 (Supp.1999) (collecting cases). However, the *Virginia Bankshares* Court recognized that even highly material statements of opinion are still just opinions.

7. In reaching this result, the court does not

course, any purely factual assertions in the fairness opinion, such as Bear Stearns' statements that it reviewed certain materials during its due diligence inquiry, would be held to a negligence standard.)

### 3. *Pleading of Liability on Part of McCall and the HBOC Outside Directors*

■■■ McCall and the HBOC Outside Directors argue that they are not liable for violations of Rule 14a–9 because they solicited proxies only from HBOC shareholders, who were not harmed by the McKesson–HBOC merger. While the court agrees that HBOC shareholders were not harmed by the merger, the merger indisputably harmed McKesson's shareholders, who also received the Joint Proxy Statement. The HBOC defendants cite no authority for the proposition that signatories to a Joint Proxy Statement are liable only to shareholders whose shares they directly solicited. This is not surprising, because courts have allowed Section 14(a) claims against accountants and investment bankers, who are not soliciting proxies at all. This follows directly from Section 14(a), which makes it "unlawful for any person … to solicit *or to permit the use of his name to solicit* any proxy or consent or authorization in respect to any security" in contravention of SEC regulations. 15 U.S.C. § 78n (emphasis added). This plainly contemplates liability to all affected shareholders, even those who were not directly solicited by defendants. Thus, anyone who knowingly participates in the distribution a proxy solicitation should therefore expect to be held liable for false statements to *all* affected shareholders. This is not an onerous result in a case such as this, where misrepresentations by directors of the target company (HBOC) almost certainly induced reliance by shareholders of the acquiring company (McKesson).

### 4. *Rule 9(b) Particularity*

Defendants argue that the Section 14(a) allegations must comply with Rule 9(b) of the Federal Rules of Civil Procedure, which requires particularized allegations of fraud, because the Section 14(a) "sounds in fraud."

■■■ As an initial matter, the court notes that the Section 14(a) claim does not "sound in fraud" as to all defendants, many of whom are not alleged to have acted intentionally.[8] The complaint is, however, grounded in fraud as to those defendants who allegedly perpetrated the fraudulent scheme. Even as to those defendants, the complaint is adequately particular—specific financial statements contained in the proxy are identified, their falsity is detailed, and the respective roles of the defendants in generating those financial statements are detailed. Requiring that a non-fraud claim be stated with particularity under Rule 9(b) does not import a scienter requirement into the pleadings; it simply requires factual specificity regarding the "neutral circumstances" of the alleged misstatement (the "who, what, where, when, and how") and the reasons why the misstatements were in fact false. The complaint here provides both, and the Section 14(a) claim is therefore sufficiently particular under Rule 9(b). The one exception, discussed above, is the pleading relating to Bear Stearns' fairness opinion, the falsity of which must be pleaded with particularity.

### 5. *Proper Pleading of the Required Statement of Mind*

■■■ Under the Private Securities Litigation Reform Act of 1995 ("the Reform Act"), all suits brought under the 1934 Act

rely on *Diaz v. Century Pac. Inv. Corp.*, 21 F.3d 1112 (9th Cir.1994) (unpublished table opinion), cited by Bear Stearns. Ninth Circuit Rule 36–3 prohibits the citation of unpublished opinions as precedent unless necessary to raise a claim of preclusion or law of the case. Rule 36–3 expressly applies to proceedings in the district courts of the Ninth Circuit.

8. Indeed, with respect to the director defendants, the allegations of the complaint sound solely in negligence.

must meet certain pleading requirements. In particular, the Reform Act imposes a heightened pleading requirement for any action in which a state of mind is an element. For such actions,

> the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2).

Lead Plaintiff concedes that the negligence required for a Section 14(a) claim is a "state of mind." The issue then becomes whether the Reform Act's heightened pleading requirements apply to claims of negligence, or only to claims requiring scienter.

This issue has received little discussion in the case law. However, the plain text of the statute provides a ready answer: any "required state of mind" is subject to a requirement of pleading of particular facts giving rise to a strong inference of that state of mind. The text of the statute provides no exception for standards of culpability lower than scienter.

Lead Plaintiff's reliance on authorities to the contrary are not persuasive. In *In re Reliance Sec. Litig.*, 91 F.Supp.2d 706, 728 (D.Del.2000), the court declined to apply a heightened pleading standard to Section 14(a) claims, because pre-Reform Act case law in the Third Circuit allowed general averments of negligence. The parties cite no controlling Ninth Circuit case law that would compel a similar holding. Plaintiff's reliance on *Paraschos v. YBM Magnex International*, 2000 WL 325945 (E.D.Pa. March 29, 2000) is also misplaced, because that case dealt with the state of mind required for a common-law claim of negligent misrepresentation.

The court accordingly holds that a Section 14(a) plaintiff must plead with particularity facts that give rise to a strong inference of negligence.

■ Under this standard, Lead Plaintiffs' Section 14(a) pleadings are largely deficient. Except with regard to the Section 10(b) defendants, Lead Plaintiff pleads no specific facts that would tend to show culpable conduct of any sort. To the contrary, the Complaint simply alleges that the Section 14(a) defendants "acted negligently and without due care in distributing, or causing to be distributed, the Joint Proxy Statement containing the false and misleading statements omissions." (Compl.¶¶ 141, 149, 147.) While such general allegations are plainly sufficient under the Federal Rules of Civil Procedure, they fail under the Reform Act.

Lead Plaintiff argues that facts pleaded elsewhere in the Complaint create a strong inference of negligence. In particular, Lead Plaintiff focuses on the magnitude of the problems uncovered by McKesson's audit, suggesting that an investigation conducted with even the slightest care would have uncovered the scope of the accounting improprieties.

■ While there is some merit to this argument, other facts pleaded in the complaint tend to negate an inference of negligence by the non-HBOC defendants, particularly by Bear Stearns and McKesson's directors, who appear to have relied on accounting done by Arthur Andersen. Arthur Andersen was, in turn, allegedly being kept in the dark about the improprieties by the responsible HBOC executives, who had hidden side letters in places inaccessible to auditors. (Comp.¶ 178.) While Arthur Andersen may or may not have been negligent in failing to uncover the improprieties, there is no suggestion in the complaint that Bear Stearns or McKesson could have known, even with reasonable diligence, that HBOC was engaged in massive accounting fraud.[9] Courts have rou-

---

9. The court is not holding, as some defendants urge, that the complaint on its face conclusively establishes an affirmative defense of reasonable reliance on experts. In the first place, this defense is applicable only to Section 11 claims, which have been dismissed for different reasons. In the second place, the court does not read the complaint to disclose an absolute bar to liability on the basis of negligence; it merely contains some

tinely held that complaints disclosing facts negating an inference scienter must, at the very least, explain such facts in order to support their claims of fraudulent intent. *See, e.g., In re Segue Software, Inc. Sec. Litig.*, 106 F.Supp.2d 161, 169 (D.Mass. 2000) (dismissing securities claim where plaintiff failed to plead facts that explained the fact, clear from the face of the complaint, that defendant had a track record of making accurate financial predictions.) This rule should apply in a negligence case as well.

Accordingly, the court will dismiss the Section 14 claims in their entirety for failure to plead with particularity facts creating a strong inference of negligence.[10]

6. *Arthur Andersen's Causation Argument*

 The court briefly addresses Arthur Andersen's argument that the complaint discloses a lack of causation between Arthur Andersen's alleged negligence and the losses incurred by McKesson HBOC shareholders. In the Ninth Circuit, loss causation requires merely that "the misrepresentation touches upon the reasons for an investment's decline in value." *In re Worlds of Wonder*, 35 F.3d 1407, 1422 (9th Cir.1994). According to Arthur Andersen, the corrective disclosure in April 1999 did not reveal any false financial data for 1996 and 1997, the years for which the accounting firm had certified HBOC financial statements. Thus, the argument goes, the April stock drop cannot be attributed to any negligence by Arthur Andersen.

facts that negate a *strong* inference of negligence, and which must be explained for the complaint to be viable.

The court is also not persuaded that McKesson's statement in the Joint Proxy Statement that it was not warranting HBOC's financials automatically insulates McKesson from liability for republishing those financials. Indeed, if McKesson had any reason to believe that HBOC's financial statements were untrue, it would have been misleading for McKesson simply to state that it was not warranting those statements without disclosing that it suspected them to be false. *Cf. Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th

The court is not persuaded. To show a lack of loss causation on the pleadings, a defendant must show that the pleadings or judicially noticeable facts reveal "truly independent causes of the plaintiffs' losses, such as a market fluctuation or a change in SEC regulations." *Moskowitz v. Vitalink Communications Corp.*, 751 F.Supp. 155, 159 (N.D.Cal.1990). Further, a corrective disclosure that does not relate specifically to defendants' alleged misconduct is not such a "truly independent" supervening cause if it is a "dependent, rather than independent, cause of the stock's plunge." *Id.* at 159. Thus, in *Moskowitz*, the court sustained a Rule 10b–5 complaint over the objection that the stock drop occurred after the company's CEO resigned, not after the company's poor financial condition was disclosed, because the resignation of the company's CEO was allegedly linked to the company's poor performance.

The facts here are even less indicative of an absolute loss causation defense. As Lead Plaintiff notes, the April 28, 1999 announcement, while only reversing revenue for transactions after March 1, 1998 transactions, stated that the audit process was ongoing and that additional reversals of revenue were possible. (Compl.¶ 41.) At the time of the disclosure, the market knew that Arthur Andersen had been auditing HBOC's books, because SEC filings—including the November McKesson Registration Statement—indicated that Arthur Andersen was continuing to review the company's financials. The market

Cir.1981), *aff'd in relevant part and rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."). Of course, the complaint does not allege any pre-merger knowledge of the fraud by McKesson.

10. With regard to the Section 10(b) defendants who are adequately alleged to have acted with scienter, it should be a relatively simple matter to restate the Section 14(a) allegations in the proper form.

therefore had ample reason to believe that the ongoing audit and additional reversals of revenue might well reach into periods covered by Arthur Andersen's certified statements, which they ultimately did. (Compl. ¶ 43.) Given all this, Arthur Andersen can hardly establish on the pleadings that its alleged negligence did not even "touch upon" the reasons for the sharp drop in McKesson HBOC share price. The complaint certainly points to no "truly independent causes" for the stock drop unrelated to the accounting improprieties that Arthur Andersen failed to find.

## C. SECTION 10(B)/RULE 10B–5 CLAIMS

Section 10(b) of the 1934 Act makes it unlawful

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . .

15 U.S.C. § 78j(b). Rule 10b–5 promulgated under Section 10(b) states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

In a Rule 10b–5 action, the plaintiff must plead and prove that the defendants acted with scienter. In the context of materially false statements, scienter consists of (1) actual knowledge that a statement being made is false, or (2) intentional recklessness to the truth of a statement at the time it is made. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir.1999); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990) (en banc). A motive for fraud, such as personal gain, is not a required element of scienter or of fraud in general. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *Prosser and Keeton, supra*, § 107, at 741 ("ultimate purpose, as to benefit the speaker, or to cause harm to the one addressed . . . . is of no importance"). However, courts do not presume that corporate officers make false statements simply out of spite or to impress others. *See Melder v. Morris*, 27 F.3d 1097, 1102–03 (5th Cir. 1994) (affirming district court's rejection of "nihilist approach" to pleading scienter and refusing to "indulge irrational inferences of . . . fraudulent intent").

Under the Reform Act, a plaintiff must plead with particularity facts that give rise to a strong inference of scienter. *See* 15 U.S.C. § 78u–4(b)(1). In order to prevent detailed but unsubstantiated "information and belief" allegations from forming the basis for this inference, Congress restricted the use of such allegations in pleadings of securities fraud. This proviso requires that all allegations made on information and belief "shall state with particularity all facts on which that belief is formed." *Id.*

1. *Common Issues Relating to Pleading of Unnamed Sources*

In *Silicon Graphics*, the Ninth Circuit held that a securities fraud plaintiff failed to create a strong inference of scienter through pleadings that charged defendants with making false statements while receiving negative internal reports and engaging in "massive" insider trading. The complaint provided few specifics about the negative internal reports, and made a conclusory allegation that defendants held

meetings at which they agreed to enter into a "conspiracy of silence" to minimize the company's problems in dealings with the public. Individual allegations were not attributed to particular sources; instead, the complaint contained one paragraph stating that plaintiff's counsel had conducted an investigation which included reviewing SEC filings, analyst reports and advisories, the company's press releases, and media coverage of the company, and (perhaps) conducting interviews with stock analysts.[11]

The Ninth Circuit held that this pleading did not meet the Reform Act's information and belief proviso. In a passage that merits full quotation, the Court of Appeals held

> that a plaintiff must provide, in great detail, all the relevant facts forming the basis of her belief. It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim. In this case, [plaintiff]'s complaint does not include adequate corroborating details. She does not mention, for instance, the sources of her information with respect to the reports, how she learned of the reports, who drafted them, or which officers received them. Nor does she include an adequate description of their contents which we believe-if they did exist-would include countless specifics regarding ASIC chip shortages, volume shortages, negative financial projections, and so on. We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics

from those reports as well as such facts as may indicate their reliability.

> In the absence of such specifics, we cannot ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge of SGI's problems that would cause their optimistic representations to the contrary to be consciously misleading. In other words, in the absence of such specifics, we cannot determine whether there is any basis for alleging that the officers knew that their statements were false at the time they were made-a required element in pleading fraud. [Plaintiff] would have us speculate as to the basis for the allegations about the reports, the severity of the problems, and the knowledge of the officers. We decline to do so.

183 F.3d at 985 (citation omitted). According to the Section 10(b) defendants, this requires, at a minimum, that all allegations based on information and belief be attributed to named (not simply identified) sources. Defendants further argue that, absent allegations attributed to unnamed sources, the allegations in the complaint are inadequate to create a strong inference that any of them acted with scienter.

There is some merit to defendants' argument. In particular, the Ninth Circuit's strong language about "unspecified sources" and unmentioned sources of information could be read to suggest that plaintiffs must name the sources of their information. The legislative history of the Reform Act reveals that the Act's opponents feared that the enacted language would require identification of sources. Based in part on this legislative history,

---

**11.** The exact statement in the *Silicon Graphics* complaint read:

> Plaintiffs have alleged the foregoing based upon the investigation of their counsel, which included a review of SGI's SEC filings, securities analysts reports and advisories about the Company, press releases issued by the Company, media reports about the Company and discussions with consultants, and believe that substantial evidentiary support will exist for the allegations [ ]

after a reasonable opportunity for discovery.

183 F.3d at 985 (alteration in original opinion). The district court in *Silicon Graphics* noted that the plaintiff's firm had submitted five complaints with virtually identical "boilerplate" allegations. *See also* 3C Bloomenthal & Woolf, *supra*, § 16.2511, at 16–290 (referring to "the one paragraph does it all ...approach").

two district courts, including the district court in *Silicon Graphics*, have interpreted the Reform Act's information and belief proviso to require naming of sources. *See In re Silicon Graphics Inc. Sec. Litig.*, 970 F.Supp. 746, 763 (N.D.Cal.1997); *In re Aetna Inc. Sec. Litig.*, Fed. Sec. L. Rep. ¶ 90,489, 1999 WL 354527, at *4 (E.D.Pa. 1999).

Nevertheless, the court agrees with Lead Plaintiff that the complaint's allegations upon information and belief are adequate under *Silicon Graphics*. What *Silicon Graphics* requires are "adequate corroborating details." An adequate complaint of securities fraud will "mention ... the sources of [plaintiff's] information." The purpose is to avoid "speculation" about defendants' knowledge and intent, because "[i]t is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim." 183 F.3d at 985. Nowhere, however, did the *Silicon Graphics* court require naming (as opposed to identification) of sources. It is possible to identify sources and provide other corroborating details without disclosing the names of sources.

The one Court of Appeals to address the issue directly has rejected the argument that defendants make. In *Novak v. Kasaks*, 216 F.3d 300 (2d Cir.2000), the Second Circuit reversed a district court's dismissal of a complaint that alleged particular facts about the defendant's accounting practices but failed to name anonymous sources who had cooperated with plaintiff's counsel:

> In fact, the applicable provisions of the law as ultimately enacted requires plaintiffs to plead only facts and makes no mention of the sources of these facts.
>
> More fundamentally, our reading of the [Reform Act] rejects any notion that confidential sources must be named as a general matter. In our view, notwithstanding the use of the word "all," paragraph (b)(1) does not require that plaintiffs plead with particularity every single

fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity *sufficient* facts to support those beliefs. Accordingly, where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. *Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.* In both of these situations, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out.

216 F.3d at 314 (second emphasis added). The court agrees with this analysis, and finds no conflict with the Ninth Circuit's opinion in *Silicon Graphics*, which did not even address this issue. As the *Silicon Graphics* court stated, Congress's purpose in enacting the Reform Act was to deter fraud lawsuits that were little more than "fishing expeditions." 183 F.3d at 988. When it passed the Reform Act, Congress meant to prohibit general allegations that corporate officers' statements were contradicted by unspecified "negative internal reports" seen by completely unidentified sources. It does not follow, however, that Congress (or the Ninth Circuit in interpreting Congress's intent) intended for the federal courts to dismiss specific allegations attributed (on an allegation-by-allegation basis) to more than a dozen past and present employees and customers of the defendant.

To be sure, each case must be evaluated on its own merits. In some cases, an unnamed source may be the only basis for plaintiff's belief that defendant knowingly made false statements. In such a case, it may be proper to require plaintiff to identify the source by name. *See In re Green*

*Tree Fin. Corp. Stock Litig.*, 61 F.Supp.2d 860, 871–72 (D.Minn.1999) (dismissing complaint of securities fraud when central basis for plaintiff's allegations of scienter was an admission made to an anonymous money manager). Even when it is not necessary for plaintiff to name sources, plaintiff's failure to identify the sources by name may somewhat reduce the weight to be given information from such unnamed sources in determining whether the allegations of the complaint create a strong inference of scienter, especially when there are relatively few identified sources.

In light of the foregoing, the court holds that the complaint's "information and belief" allegations are sufficient under the Reform Act and should be considered by the court with due consideration of their reliability and specificity.

### 2. *Common Issues Relating to Pleading of Media Reports*

Another common pleading issue is the degree to which the court should credit allegations made in media reports.

Some defendants appear to argue that the newspaper articles should be discounted because they are hearsay. This objection is not well-taken, because all pleadings on information and belief are hearsay. Even under the Reform Act, plaintiffs are only required to plead facts, not to produce admissible evidence.

■ Instead, the test is whether the plaintiffs have pleaded "particular" facts that give rise to a strong inference of scienter. To the extent that a newspaper article corroborates plaintiff's own investigation and provides detailed factual allegations, it can—at least in combination with plaintiff's investigative efforts—be a reasonable source of information and belief allegations. *Cf. Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir.1982) ("Reliance on an article in *The Wall Street Journal* is not reliance on an insubstantial or meaningless investigation."). To be sure, newspaper articles should be credited only to the extent

that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel. *See Haft v. Eastland Fin. Corp.*, 772 F.Supp. 1315 (D.R.I.1991) (holding that recounting of analysts' opinions did not prove "underlying factual support" necessary to create a strong inference of scienter). However, if the newspaper article includes numerous factual particulars and is based on an independent investigative effort, it is a source that may be credited in determining whether plaintiffs have alleged facts sufficient to raise a strong inference of scienter.

Having addressed pleading issues common to all defendants, the court now turns to the specific allegations of fraudulent intent. The court first addresses allegations concerning the alleged fraudulent scheme to inflate revenue. The court then turns to the adequacy of the charges linking the individual defendants to the alleged scheme. Finally, the court turns to the adequacy of the complaint's "control person" allegations under Section 20(a) of the 1934 Act.

### 3. *Allegations Detailing Nature and Extent of the Alleged Fraud*

■ The court first addresses the sufficiency of the allegations that HBOC officers perpetrated an intentional scheme to inflate corporate revenues.

The parties devote considerable attention to the First Circuit's opinion in *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir.1999), another case involving allegations that management intentionally misbooked contingent software transactions as revenue-creating sales. The court agrees that *Greebel* is instructive.

Defendants rely on *Greebel* for the proposition that allegations of GAAP violations, standing alone, do not create a strong inference of scienter.[12] This is a correct

---

**12.** Defendant McCall argues that the side let- ters are not inherently fraudulent, particularly

statement of the law, but it does not mean that detailed allegations of GAAP violations cannot support a strong inference of scienter. Courts that have discounted allegations of GAAP violations as evidence of fraud have never held that GAAP violations are proper or cannot constitute fraud. Instead, courts have rejected attempts to bootstrap conclusory allegations of GAAP violations into proof of intentional or reckless misconduct.

However, when significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves. In *Greebel*, the First Circuit provided a non-exclusive list of particular allegations that plaintiffs should provide when alleging irregularities in revenue recognition: (1) "such basic details as the approximate amount by which revenues and earnings were overstated"; (2) "the products involved in the contingent transactions"; (3) "the dates of any of the transactions"; or (4) "the identities of any of the customers or [company] employees involved in the transactions." 194 F.3d at 204. Equipped with such information, a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue. When there are substantial allegations that the violations were of the latter variety, a strong inference arises that senior management intentionally misstated earnings.

Lead Plaintiff's complaint provides all the information required by *Greebel*. More than simply providing "approximate amounts" for the alleged revenue inflation, the complaint compares the pre- and post-disclosure accountings performed by Arthur Andersen and Deloitte Touche. It would be impossible to require anything more specific. The corrected accounting reveals that revenue inflation exceeded 25% in some quarters. The complaint also details numerous individual transactions during the class period, involving a variety of customers around the country and several HBOC officials (including all the defendants), revenue from which was recognized and subsequently reversed.

Although allegations of "manifest" scienter are disfavored, Lead Plaintiff has alleged substantial evidence that improper recognition was so widespread at HBOC that senior management must have known of the practice. This is powerful circumstantial evidence of scienter.

Plaintiffs also allege much more direct evidence of scienter. According to the *Wall Street Journal* excerpts provided in the complaint, McKesson HBOC's investigators concluded that HBOC's executives intentionally overstated revenue. The complaint also details the facts that led McKesson HBOC's investigators to this conclusion, such as the segregation of side letters from contracts and the deletion of critical computer files.[13] Thus, it is not surprising that McKesson HBOC issued harsh statements about the executives it held responsible for the episode:

- McKesson HBOC announced in a press release that it had removed McCall as Chairman of the Board and that he had been "dismissed as an employee."
- Bergonzi, Held, Lapine, and Smeraski were "dismissed immediately for cause." McKesson HBOC later re-

---

when executed after a contract has been signed. (McCall's Reply at 4:19—5:9.) This is true, but the complaint alleges much more: that side letters were executed contemporaneously with contracts and then filed in separate locations, so that auditors would be ignorant of the contracts' contingent nature. In his brief, McCall offers no legitimate reason for such practices.

13. Obscuring financial data from auditors is a strong indication of fraud. In *Greebel*, the First Circuit characterized allegations of "whiting out" of contingencies as "direct" and "strong" evidence of scienter. However, the claim was dismissed on summary judgment for failure to produce admissible evidence of the practice. *See* 194 F.3d at 201–02.

vealed that these four were barred from the company's premises.

- The terminated executives were criticized by the company's new chairman for their "participation ... in such improprieties."
- The new chairman stated that the perpetrators of the scheme had processed software shipments "to generate the appearance of revenue." The company's spokesperson told an industry publication: "One must assume that the intent of this entire episode was to inflate revenues. The responsible individuals have been fired for cause ...."
- The Company's CEO stated that the four officials fired "for cause" either "should have known, or did know, of the accounting problems". The company's spokesperson told the *Atlanta Constitution* stated that "all the restatements represent accounting improprieties or irregularities." As Lead Plaintiff notes, "irregularities" is an accounting term of art referring to intentional misstatements and omissions (as opposed to "improprieties" which relate to errors of any sort).

The company's statements about the fired employees and their participation in HBOC's improper accounting practices may not be direct admissions by the individual defendants themselves. They are, however, strong circumstantial evidence of fraud. Companies do not routinely announce massive restatements of revenue accompanied by press releases announcing that various employees have been fired "for cause." It is certainly not routine to state that the terminated employees "knew or should have known" about accounting improprieties. One can only assume that McKesson HBOC had a factual basis for such statements.

Finally, the complaint also provides several allegations of "red flags" being waved by others in the company about the improper accounting practices. Such evidence is highly probative of scienter, because it tends to negate the possibility of innocent mistake. The complaint's evidence in this regard is particularly specific, especially with regard to defendant Smeraski's initial effort to regularize the company's revenue recognition practices, before he was allegedly dissuaded by other defendants from pursuing the matter. (Compl.¶ 184.) These allegations fall squarely within the class period, and are powerful evidence that the irregular accounting practices detailed in the complaint were known to and condoned by senior HBOC management.

The court accordingly holds that the complaint adequately alleges the existence of a fraudulent scheme to inflate revenue by recognizing contingent, consignment, or even non-existent transactions as sales.[14] This scheme culminated in the publication of false financial data in the company's publicity and SEC filings. The court now turns to the allegations concerning particular defendants and their complicity in the alleged fraud.

### 4. Pleading of Bergonzi's Liability

██ Defendant Albert Bergonzi was co-COO of HBOC during the relevant period. He personally negotiated the Baylor College of Medicine contract, in which $1 million in non-existent sales were booked. (Compl.¶¶ 181e, 182e.) Bergonzi has also been specifically linked to the decision to book revenues on the Quorum sale months before the contract was signed. (Compl.¶ 183e.) (Although the Quorum sale took place before the class period, it is still relevant to the issue of Bergonzi's knowledge and intent.) He also negotiated the Baptist Hospital transaction for which HBOC prematurely and improperly booked revenue. (Compl.¶ 183f.) A for-

---

**14.** In so holding, the court is not crediting Lead Plaintiff's allegations of motive, which consist largely of alleging incentive compensation. Courts have consistently rejected efforts to characterize incentive compensation as a substantial motive for fraud, because holding this to be a sufficient motive "would effectively eliminate the state of mind requirement as to all corporate officers and defendants." *Melder*, 27 F.3d at 1102.

mer HBOC employee states that Bergonzi was involved in revenue recognition decisions, encouraging others to post contingent, consignment and even non-existent sales as revenue. (Compl.¶¶ 182–183.) Bergonzi was one of the four employees dismissed for cause and was barred from the company's premises. These allegations are sufficient to link Bergonzi to the alleged fraudulent scheme.[15]

### 5. *Pleading of Gilbertson's Liability*

 Defendant Jay P. Gilbertson is a former CFO, President, and Co–CCO of HBOC. He resigned from the company in November 1998, before the merger was effected.[16] Together with Bergonzi, he allegedly made the decision to book revenues on the Quorum transaction before a contract was signed. (¶ 183e.) He is noted to have discussed the use of side letters. (¶ 182c.) Along with others, he resisted Smeraski's attempts to regularize accounting practices. (¶ 183.) At least one insider identifies him as having principal responsibility for revenue recognition when he was with the company. (¶ 183.) These are also sufficient allegations of scienter.

### 6. *Pleading of Lapine's Liability*

 Jay Lapine was a senior VP and general counsel of HBOC. As General Counsel, he had to approve every contract. (¶ 181d.) He and Bergonzi are linked in the complaint to a $20 million dollar transaction associated with Data General. (¶ 202.) One source states that Lapine participated in discussions about side letters, and that it was common within the company during such discussions to use the expression "take a side letter and put it in a drawer." (¶ 182c.) He was involved in decisions regarding booking of revenue. (¶ 183c.) He was one of the four employees fired "for cause" and barred from the company's premises. These are sufficient allegations of scienter.

### 7. *Pleading of Smeraski's Liability*

 Michael Smeraski was the National Sales Director of HBOC. He is directly implicated in the alleged scheme to inflate revenues. He was told by a subordinate that at least two contracts were improperly recorded as revenue but did not reverse the revenue. (¶ 184b.) In 1998, Smeraski told his own superiors that revenue booking practices were improper, but continued on as National Sales Director even though the questionable accounting practices continued. (¶ 184a.) He was one of the four employees dismissed "for cause" and barred from company premises.

### 8. *Pleading of McCall's Liability*

 McCall was the Chairman and CEO of HBOC at the time of the merger. He is alleged to have encouraged the use of side letters and the improper recognition of contingent, consignment and fictitious sales. McCall received correspondence from Marshall Hospital, an HBOC customer, detailing several side letters and discussing several problems relating to the fulfillment of HBOC's obligations under those side letters. (¶¶ 187, 188.) McCall allegedly encouraged improper recognition of contingent, consignment, and fictitious sales, and he resisted Smeraski's initial attempts to regularize accounting procedures. (¶¶ 183b, 184a.)

---

**15.** Together with McCall and Gilbertson, Bergonzi argues that some of the statements attributed to him are not actionable because they were immaterially vague statements of corporate optimism. However, all the statements attributed to defendants—even the most forward-looking ones—include references to specific transactions that were improperly recognized (e.g., Bergonzi's description of the Baptist Memorial deal, ¶ 167e) or to the company's historical sales figures, which were inflated because of the alleged fraud. Thus, the court holds that these statements are actionable notwithstanding their optimistic slant. *See generally Warshaw v. Xoma Corp.,* 74 F.3d 955 (9th Cir.1996).

**16.** Gilbertson argues that the company's failure to fire him distinguishes him from the "responsible individuals" fired for cause. Given that Gilbertson had already left the company, it would (obviously) have been impossible for McKesson HBOC to dismiss him, with or without cause.

McCall argues that he was only "removed" as Chairman of the Board of Directors, and that he was only "dismissed" as an employee, instead of being "dismissed for cause" like the other HBOC executives. The court is not persuaded that this meaningfully distinguishes McCall from the other terminated executives. The press release that announced his termination criticizes "senior level employees" for participating in the "accounting improprieties," which were serious enough to require "prompt and decisive action." (¶ 170a.) The press release does not say that McCall's conduct was less culpable than that of the other employees, or that he was being fired only because he had allowed himself to be deceived by the others. After it terminated McCall, the company publicly disputed his attempts to characterize the whole episode as a disagreement over technical accounting rules, stating through a spokesperson: "One must assume that the intent of this entire episode was to inflate revenues." (Compl.¶ 170d.)

Moreover, this is the rare case where the scope of the alleged fraud is so breathtaking and so well substantiated in the pleadings that a strong inference arises that senior management at HBOC must have known what was going on. Thus, even without the specific links to fraudulently recognized transactions, the complaint's allegations are sufficient to raise the requisite inference of McCall's scienter.

### 9. Pleading of Pulido's Liability

■ Mark Pulido is the only individual non-HBOC defendant to be charged with a Section 10(b) violation. He was not one of the employees terminated when the accounting improprieties were disclosed, although he did resign from the company shortly thereafter. As evidence of Pulido's scienter, plaintiff relies on an *Atlanta Constitution* article stating that McCall had claimed that Pulido had pushed the booking of revenue on a $20 million "bad piece of business" that was subject to an unfulfilled contingency and had been backdated. This transaction was, apparently, a deal with Data General Corporation. (Compl.¶¶ 202, 215.)

This is insufficient evidence that Pulido acted with scienter. A statement by another defendant implicating Pulido is not particularly reliable evidence. Moreover, the *Atlanta Constitution* article does not identify the particular transaction by name, and does not provide any details of the backdating and the alleged contingency. Lead Plaintiff provides no other evidence of Pulido's scienter, and does not even provide a plausible motive for Pulido's interest in inflating revenue, for instance, insider trading. Thus, the complaint fails to state a Section 10(b) claim against Pulido.

### 10. Pleading of McKesson HBOC's Liability

■ Plaintiff alleges that McKesson HBOC published several false financial statements during the class period that recapitulated HBOC's false financial data: two press releases and an SEC filing for the quarter ended December 31, 1998.

Although McKesson HBOC has admitted that its statements were, in retrospect, false, plaintiff fails to plead any facts suggesting that McKesson HBOC knew or was deliberately reckless to the truth prior to the date McCall became the chairman of its board. Indeed, the complaint alleges numerous facts that suggest that McKesson HBOC was unaware of the financial improprieties at HBOC, which remained a separately incorporated entity, up until the Deloitte Touche audit.

Lead Plaintiff also argues that McKesson HBOC is liable as a "successor" to HBOC. This argument might have some merit if McKesson and HBOC had structured their merger differently. However, both the November McKesson Registration Statement and the Joint Proxy Statement, which Lead Plaintiff references in its complaint, describe a merger transaction in which HBOC would merge with a subsidiary of McKesson, and HBOC would

become a "wholly-owned subsidiary of McKesson." (Christopher Decl. Ex. 2 [Joint Proxy Statement] at 10 and again at 12.) A parent is not vicariously liable for the securities fraud of its subsidiary. *See Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir.1996).

Lead Plaintiff argues that McKesson HBOC is the "de facto" successor to HBOC and thus may be held liable for HBOC's securities fraud. However, a "reverse triangular merger" of the sort performed here (merger of the target with a specially formed subsidiary of the acquirer, which then becomes the sole shareholder of the newly merged subsidiary), does not effect a "de facto" merger unless the transaction has been structured to disadvantage creditors or shareholders. *See Orzeck v. Englehart*, 195 A.2d 375, 378 (Del.Supr.1963). Lead Plaintiff pleads no facts that would so suggest.

 While McKesson HBOC is not liable as successor to HBOC, it is vicariously liable for the fraud of its own officers. *See Hollinger*, 914 F.2d at 1576–78 (recognizing that there are two forms of secondary liability for violations of Section 10(b): the statutory "control person" liability set forth in Section 20(a) and the common law doctrine of *respondeat superior*). After the merger, defendant McCall became Chairman of the Board of McKesson HBOC. During his tenure, McCall allegedly repeated false statements about HBOC's revenues. McKesson HBOC is therefore liable under the doctrine of *respondeat superior* for any fraud perpetrated by McCall.[17]

The court accordingly denies the motion to dismiss the Section 10(b) claim as to McKesson HBOC.

11. *Pleading of Control Person Liability*

The final issue remaining with the Section 10(b) claims is the adequacy of the control person claims, which are brought under Section 20(a) of the 1934 Act.

A control person need not be a "culpable participant" in the alleged fraud. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir.1990) (en banc) (rejecting the "culpable participant" doctrine); *see also* 3C Bloomenthal & Woolf, *supra*, § 14:9 (discussing *Hollinger* and other cases in accord). However, plaintiffs must still plead and proved that defendants exercised "a significant degree of day-to-day operational control, amounting to the power to dictate another party's conduct or operations." *In re ZZZZ Best Sec. Litig.*, 864 F.Supp. 960, 970 (C.D.Cal.1994).

The pleadings of control person liability are insufficient, because they do not identify how the Section 20(a) defendants controlled specific Section 10(b) defendants. Although this may be a simple pleading matter as to some defendants (particularly McCall vis-a-vis the other HBOC defendants), it appears that other defendants were either too low-ranking to be control persons (perhaps Bergonzi and Smeraski) or were to distant to exercise day-to-day control (such as Pulido vis-a-vis the HBOC defendants).

The control person claims are therefore dismissed with leave to amend with particularity the manner in which the defendants exercised day-to-day control over defendants properly alleged to have committed violations of Section 10(b).

D. **BREACH OF FIDUCIARY DUTY CLAIMS AGAINST INDIVIDUAL MCKESSON DEFENDANTS**

 Lead Plaintiff claims that McKesson's outside directors violated their fiduciary duties to McKesson shareholders by failing to investigate HBOC's financial condition adequately, issuing a Proxy Statement containing materially false information, and agreeing to a merger that was materially unfair to McKesson shareholders.

---

**17.** As noted in the previous section, Lead Plaintiff has failed to plead sufficient facts

indicating that McKesson HBOC CEO Pulido acted with scienter.

As defendants note, these alleged failures amount at most to breaches of the duty of care. *See In re Lukens Shareholders Litig.*, Consol. Case No. 16102, 1999 Del. Ch. LEXIS 233, at *30 (Del. Ch. Aug. 17, 1999) (holding that allegations of gross negligence against directors for approving a merger and issuing a false proxy statement did not implicate a breach of the duties of disclosure or loyalty).

Lead Plaintiff's claims for breach of care must fail for three reasons.

First, under Delaware law, conclusory assertions that directors breached their fiduciary duty of care are inadequate; rather, the complaint must contain well-pleaded allegations to overcome the presumption that the directors' decisions were informed and reached in good faith. *See In re Santa Fe Pac. Corp. Shareholder Litig.*, 669 A.2d 59, 71 (Del.1995); *see also Unocal v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985) (stating Delaware's Business Judgment Rule). Lead Plaintiffs' complaint lacks any such allegations. Indeed, the complaint recounts numerous facts suggesting that (1) the directors adequately informed themselves by seeking a fairness opinion from Bear Stearns; and (2) that the perpetrators of the alleged fraud went to great efforts to conceal their wrongdoing from others, including the director defendants.

Second, McKesson's charter bars claims for monetary relief premised on a breach of the duty of care.[18] To the extent that the complaint seeks monetary relief from the McKesson director defendants, it fails to state a claim upon which relief may be granted. *See* Del.Code. Ann. tit. 8, § 102(b)(7) (authorizing corporations to adopt exculpatory clauses regarding directors' duty of care); *Lukens*, 1999 Del. Ch. LEXIS 233, at *34–39 (dismissing claim for money damages arising from alleged breach of duty of care).

Third and finally, Lead Plaintiff lacks standing to assert an individual (or even class) claim for breach of fiduciary duty because it is plain from the face of the complaint that all McKesson shareholders—including the director defendants—suffered losses on account of the directors' alleged negligence. Absent a "special injury" affecting only certain shareholders, a claim for breach of the fiduciary duty of care must be brought derivatively on behalf of the corporation. *Lipton v. News Int'l, Plc*, 514 A.2d 1075, 1078 (Del.1986).

The court therefore dismisses the claims for breach of the fiduciary duty of care.

## IV. ORDER

For the foregoing reasons, the court rules on the motions to dismiss as follows:

Counts I–IX of the complaint are dismissed with prejudice as to all defendants.

Counts X–XII of the complaint are dismissed with leave to amend if Lead Plaintiff can in good faith allege particular facts that give rise to a strong inference that defendants failed to exercise due care in connection with their statements in the proxy solicitation.

Count XIII is pleaded adequately as to all defendants and the motions to dismiss Count XIII are denied.

Count XIV is dismissed with leave to amend if Lead Plaintiff can in good faith allege with particularity facts that give rise to a strong inference that defendant Pulido acted with scienter.

County XV is dismissed with leave to amend if Lead Plaintiff can in good faith allege facts suggesting that defendants exercised day-to-control over the defendants properly alleged to be liable under Section 10(b).

Count XVI is dismissed. Lead Plaintiff may amend the count if it can allege in good faith facts indicating both "special injury" to Lead Plaintiff and bad faith misconduct or disloyalty.

---

18. Lead Plaintiff does not dispute that the court may take judicial notice of McKesson's articles of incorporation.

Lead Plaintiff shall file a Second Amended and Consolidated Class Action Complaint no later than thirty (30) days after service of this order.