218 F.3d 144 (2nd Cir. 2000)
 LEONARD MINZER and HARRY SCHIPPER, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
GERALD C. KEEGAN, PHILIP F. RUPPEL, GEORGE H. SORTER, GWENDOLYN CALVERT BAKER, WILLIAM F. DE NEERGAARD, JAMES G. PEEL, C. STEPHEN CONNOLLY, WILLIAM F. WARD, NICHOLAS A. MARSHALL, PETER C. HAEFFNER, JR., GREATER NEW YORK SAVINGS BANK, ASTORIA FINANCIAL CORP., ASTORIA FEDERAL SAVINGS AND LOAN ASSOCIATION, and ASTORIA FEDERAL SAVINGS & LOAN, Defendants-Appellees,
MICHAEL HENCHY, DANIEL J. HARRIS, PHILIP CIMINO, PHILIP SPIES, and R. CARLSON, Defendants.
 Docket No. 99-7199
August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: October 12, 1999
Decided: July 10, 2000
 
 Appeal from an order of the United States District Court for the Eastern District of New York (Charles P. Sifton, Judge) dismissing a complaint alleging that a proxy statement seeking approval of a proposed merger was materially misleading. We affirm on the ground that the alleged omissions on the proxy statement would upon rectification not have made any reasonable investor less likely to approve the objected-to merger.
 JOSEPH H. WEISS, Weiss & Yourman (Jules Brody, Stull, Stull & Brody, on the brief), New York, New York, for Plaintiffs-Appellants.
 JOEL B. HARRIS, Thacher, Proffitt & Wood (Jonathan D. Forstot, Charles T. Caliendo, on the brief), New York, New York, for Defendant-Appellees Astoria Financial Corporation, Astoria Federal Savings and Loan Association, Gerald C. Keegan, and Greater New York Savings Bank.
 MICHAEL H. BARR, Sonnenschein Nath & Rosenthal (Steven K. Barentzen, on the brief), New York, New York, for Defendant-Appellees Outside Directors of Greater New York Savings Bank.
 Before: WINTER, Chief Judge, NEWMAN, Circuit Judge, and KEENAN, District Judge.*
 WINTER, Chief Judge:
 
 
 1
 Leonard Minzer and Harry Schipper, on behalf of themselves and similarly situated shareholders, appeal from then-Chief Judge Sifton's dismissal of their complaint. It alleged that a proxy statement seeking shareholder approval of a proposed merger was materially misleading, in violation of Section 14(a) of the Exchange Act, see 15 U.S.C. § 78n(a), and Rule 14a-9, see 17 C.F.R. § 240.14a-9(a). Appellants also alleged a breach of state law fiduciary duties. We affirm the dismissal of the federal claim on the ground that the allegedly material omissions in the proxy statement would not have induced any reasonable investor to be less likely to approve the objected-to merger. There was, therefore, no causal link between the omissions and any harm resulting from approval of the merger. We dismiss appellants' state law claims without prejudice.
 
 BACKGROUND
 
 2
 In reviewing a dismissal under Rule 12(b)(6), we take as true the allegations of the complaint, here the second amended corrected complaint and the proxy statement, which is incorporated by reference. See, e.g., Koppel v. 4987 Corp., 167 F.3d 125, 128 (2d Cir. 1999).
 
 
 3
 In early 1997, Gerald Keegan, the president of Greater New York Savings Bank ("Greater New York"), began exploratory merger talks with the top management of Astoria Financial Corporation and its subsidiary Astoria Federal Savings and Loan Association (collectively, "Astoria"). On February 26, 1997, Thomas O'Brien, the Vice Chairman of North Fork Bancorporation, Inc. ("North Fork"), phoned Keegan and informed him of North Fork's interest in a merger with Greater New York. The negotiations with Astoria continued, and, on March 16, Astoria's Chief Executive Officer informed Keegan that Astoria would, subject to due diligence -- essentially an inspection of Greater New York's books -- be willing to pay approximately $18 per share in cash and stock for Greater New York's stock. The next day, John A. Kanas, North Fork's Chief Executive Officer, called Keegan and informed him that North Fork had acquired a significant stake in Greater New York and that he desired a face-to-face meeting to discuss a merger. Keegan declined the invitation, stating that Greater New York was not planning to merge and that he was unwilling to talk to North Fork under any circumstances. However, that same day, Keegan discussed both the Astoria offer and the North Fork expression of interest with his board. The board authorized Keegan to proceed with the Astoria transaction.
 
 
 4
 Also on the same day, Kanas drafted a strongly worded letter expressing his disappointment at Keegan's refusal to arrange a meeting and offering a 2-for-1 stock-for-stock merger, subject to "customary due diligence." This offer would have allegedly valued Greater New York's stock at approximately $19 per share. Kanas never sent that letter but did send a milder letter four days later. Either the same day or the next, Christopher Quackenbush, a principal at Sandler O'Neill & Partners, L.P., Greater New York's investment bank, suggested to Kanas that Greater New York "was willing to reconsider." The two arranged a telephone conversation for March 19.
 
 
 5
 Between March 19 and March 27, 1997, Quackenbush had a series of telephone calls with Kanas and O'Brien. Kanas asked to make a presentation to Greater New York's board, but no such opportunity was offered. O'Brien pressed for the opportunity to conduct due diligence and told Quackenbush that "in the absence of due diligence, North Fork did not know if everything was as it had modeled it or presumed it to be and that diligence was very important and was necessary before making any kind of final offer." North Fork was never given the opportunity to conduct due diligence and had to rely solely on publicly available information in determining Greater New York's financial condition. Astoria, however, was given an opportunity to conduct due diligence and acquire nonpublic financial information about Greater New York.
 
 
 6
 Greater New York convened a special meeting of its board on March 27, 1997. Kanas went to Greater New York's offices but was denied entry to the meeting. Nevertheless, Quackenbush informed Kanas by telephone that the board was interested in as many details as were available about North Fork's bid. Kanas offered a stock-for-stock merger in which North Fork would acquire Greater New York, exchanging .486 North Fork shares per Greater New York share (approximating the value of the offer to be $19.00 per share). Quackenbush asked if that was North Fork's best offer; Kanas replied, "that was our best bid until such time as we would be allowed to go in and . . . [conduct] due diligence." He informed Quackenbush that he had a team of bank officers prepared to work over the weekend to conduct due diligence, and that North Fork was "unwilling to raise [its] price or consider raising [its] price until such time as [it] had a chance to [conduct due diligence]." In refusing to increase North Fork's bid, Kanas told Quackenbush that "North Fork's bid included a substantial one-time charge to cover credit related issues," but that North Fork had "already factored that [charge] in so [its] price wo[uld]n't go down." After Quackenbush pressed him as to whether the price would go up, Kanas replied, "it won't go down." Kanas was also asked whether Keegan would have a major role to play in any such merged enterprise, to which Kanas responded in the negative.
 
 
 7
 Quackenbush described his conversations with Kanas to Greater New York's board, which in turn requested Astoria to increase its bid. Astoria raised its stock and cash bid to $18.94. This price included a substantial premium over Greater New York's trading price. Two days later, on March 29, 1997, Greater New York's board unanimously approved a merger with Astoria. As a part of the merger agreement, Greater New York's board agreed to termination fees capped at $5 million (with a maximum aggregate profit capped at $10 million) in the event that the merger did not go through and a lock-up option allowing Astoria to purchase 19.9% of Greater New York's outstanding common shares under certain conditions. Also, Greater New York agreed not to entertain any other inquiries about a merger. Finally, it is alleged that Keegan was employed by Astoria as part of the merger agreement, and Greater New York's board members were given three-year contracts providing them a stipend and stock options in return for serving on the Astoria Advisory Board.
 
 
 8
 On March 31, 1997, Greater New York and Astoria publicly announced the merger. Within seventy-two hours of that announcement, appellants filed a New York state court action against Greater New York's board for alleged breaches of fiduciary duty. The parties subsequently consented to dismiss that state court action without prejudice.
 
 
 9
 On June 24, 1997, Astoria and Greater New York distributed proxy statements seeking their respective shareholders' approval of the transaction. The portions of Greater New York's proxy statement relevant to the present appeal are as follows:
 
 
 10
 On March 17, 1997, Mr. Keegan received a call from the chief executive officer of another banking organization (the "Other Organization") expressing an interest in acquiring [Greater New York].
 
 
 11
 Mr. Keegan reported the contact with the chief executive officer of the Other Organization to the [Greater] Board at a special meeting on March 17, 1997. . . .
 
 
 12
 Subsequently, the chief executive officer of the Other Organization initiated a series of telephone calls with Mr. Keegan and [Greater New York's] investment bankers, Sandler O'Neill, regarding its interest in [Greater New York] and seeking the opportunity to make a proposal regarding a possible business combination with [Greater New York]. As part of these discussions and at the request of [Greater New York], the Other Organization submitted a letter intended to address its views on how an acquisition by it would impact the communities and customers served by [Greater New York] and its employees.
 
 
 13
 . . . . At [a special] meeting, the [Greater New York] Board considered, among others, the strategic alternatives available to [Greater New York], the [Astoria] proposal and the alternatives to the [Astoria] proposal, including a possible combination with the Other Organization, and their feasibility.
 
 
 14
 As part of the [Greater New York's] Board's deliberations, it instructed Sandler O'Neill to contact the Other Organization to inquire as to the consideration it would be willing to provide to [Greater New York's] shareholders in a combination with [Greater New York] and its ability to move expeditiously to sign a definitive agreement with respect to such a transaction. The Other Organization responded with a proposal that involved a combination conditioned on "pooling of interests" accounting treatment and consideration consisting of a fixed exchange ratio of the Other Organization's common stock that had a value of $18.53 per share of [Greater New York] Common Stock based on the closing price of the Other Organization's common stock on March 27, 1997. Sandler O'Neill asked the Other Organization to increase its price and it declined to do so. The Other Organization also indicated that it could move expeditiously to enter into a definitive agreement. This proposal was immediately communicated to the [Greater New York] Board.
 
 
 15
 The proxy statement also contained a statement by Sandler O'Neill that the merger was "fair, from a financial point of view" and a recommendation of Greater New York's board that the shareholders approve the proposed Astoria merger.
 
 
 16
 On July 18, 1997, appellants initiated the instant lawsuit in the Eastern District of New York. Their complaint alleged that the proxy statement was materially misleading and that Greater New York's directors had breached state law fiduciary duties in negotiating and recommending the Astoria merger. On August 1, 1997, the shareholders of Astoria and Greater New York approved the merger. The district court reserved decision on appellees' motion to dismiss and ordered expedited discovery. Appellants obtained document discovery and deposed, inter alia, Keegan, Kanas, and Quackenbush. On September 2, appellants amended their complaint to reflect the fruits of that discovery.
 
 
 17
 On September 22, 1997, the district court issued a written decision denying appellants' motion for a preliminary injunction to block the merger, see Minzer v. Keegan, No. 97-CV-4077, 1997 U.S. Dist. LEXIS 16445 (E.D.N.Y. Sept. 22, 1997), and the merger was subsequently effected. On June 1, 1998, the district court granted defendant's motion to dismiss the amended complaint without prejudice. See Minzer v. Keegan, No. 97-CV-4077 (E.D.N.Y. June 1, 1998). Appellants thereafter amended their complaint again, and on January 25, 1999, the district court dismissed the second amended complaint. See Minzer v. Keegan, No. 97-CV-4077 (E.D.N.Y. Jan. 25, 1999). This appeal followed.
 
 DISCUSSION
 
 18
 We review a Fed. R. Civ. P. 12(b)(6) dismissal de novo and may affirm only if it appears beyond doubt that appellants can prove no set of facts that would entitle them to relief. See Koppel, 167 F.3d at 130.
 
 
 19
 Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, states that:
 
 
 20
 No solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . .
 
 
 21
 17 C.F.R. § 240.14a-9(a). There is an implied private right of action under Rule 14a-9. See J.I. Case Co. v. Borak, 377 U.S. 426, 431 (1964).
 
 
 22
 Appellants allege a violation of Rule 14a-9 as to the proxy statement's disclosure regarding three matters: (i) North Fork's attempts to negotiate a merger with Greater New York and the thwarting of those efforts; (ii) the Sandler O'Neill opinion as to the fairness of the terms of the Astoria merger; and (iii) the recommendation of Greater New York's board regarding the Astoria merger. We address each in turn.[1]
 
 
 23
 a) North Fork's Efforts to Negotiate a Merger
 
 
 24
 With regard to North Fork's efforts to negotiate a merger and appellees' thwarting of those efforts, appellants catalog the following as material omissions in the proxy statement:
 
 
 25
 i) the competing offeror [North Fork] was a serious, motivated institution that already had a considerable stake in [Greater New York] and which had the wherewithal and interest to compete on a level playing field if allowed to do so;
 
 
 26
 ii) [North Fork] did not flatly decline to raise its price;
 
 
 27
 iii) [North Fork] was arbitrarily denied due diligence by [Greater New York] and/or Keegan which could have supplied information justifying a premium bid by [North Fork];
 
 
 28
 iv) [North Fork] remained interested in [Greater New York] even after declining to raise its bid, subject to due diligence;
 
 
 29
 v) [North Fork] proposed a better and higher offer than Astoria's, when scrutinized, even without the due diligence afforded Astoria;
 
 
 30
 vi) defendants were not even-handed and balanced with [North Fork] because they denied it the due diligence information needed in order to facilitate and elicit a competitive bid from [North Fork] but did furnish it to Astoria; and
 
 
 31
 vii) the Board may have entertained Astoria and not [North Fork] because [North Fork] was not prepared to offer employment to [Greater New York] Board members (including Keegan), but Astoria was.
 
 
 32
 Appellants' Br. at 12-13.
 
 
 33
 We may assume that the omitted information would have been important to a reasonable shareholder in determining how to vote on the proposed merger with Astoria and thus meets the standard definition of materiality. See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) (holding that an omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote"). However, in the proxy context this definition of materiality assumes that the omitted information would have influenced a reasonable shareholder against the proposed transaction for which proxies were sought. Here, the omitted information would not have made a reasonable shareholder any less likely to favor the objected-to transaction, and such an omission, material or not, could not have caused the injury for which damages are sought.
 
 
 34
 In Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083 (1990), the Supreme Court held that a materially misleading proxy solicitation was not actionable where the controlling shareholder had enough votes to approve the objected-to transaction without seeking proxies. See id. at 1099-1108. The rationale of that holding applies equally to cases where the omissions would have caused a reasonable shareholder to favor rather than disfavor the transaction. In Virginia Bankshares, the omissions were not actionable because the disputed transaction would have occurred even if the proxy statement had been complete and accurate. See id. at 1107-08. That is also the case here. Had a reasonable Greater New York shareholder been fully informed, that shareholder would not have been any less likely to vote for the Astoria merger knowing of the cataloged information than being ignorant of it.
 
 
 35
 The matters omitted amount to the following: Greater New York's board and management were determined to reject a merger with North Fork and to bring about a merger with Astoria, at least in part because Astoria was offering future employment to the members of the board and Keegan. However, a reasonable shareholder would, upon learning such information, hardly be induced to vote against the merger with Astoria. At the time of the vote, a fully informed, reasonable shareholder would calculate that a defeat of the Astoria merger would leave Greater New York's shareholders with the existing management and corporate structure but without the substantial premium available in the Astoria deal. Such a shareholder would not believe, as appellants posit, that there was a substantial likelihood of a near-term and more favorable merger with North Fork after rejection of the Astoria merger.
 
 
 36
 The complaint alleged that North Fork continued to have an "interest" in Greater New York, but a reasonable shareholder would have grave doubts about whether that "interest" would ever culminate in a merger with Greater New York, at least in the near term. The termination fee and lock-up option in the Astoria merger agreement hardly made Greater New York a more tempting target for North Fork, and the complaint offers no concrete assurance that North Fork would have made an offer significantly better than Astoria's. More significantly, even if North Fork's desire for Greater New York led it to offer more favorable terms than Astoria's bid, a reasonable shareholder would anticipate that Greater New York's board and management would mount defensive measures effectively thwarting any offer by North Fork. The complaint alleged that the board and management did not want to talk with North Fork "under any circumstances," and there is little in New York law that would force them to abandon that stance. For example, there is no statutory law or caselaw requiring the board to consider merger offers or, in the presence of such offers, to conduct a fair auction. Indeed, there are New York statutes that allow management considerable leeway in defending against hostile takeovers, see N.Y. Bus. Corp. Law §§ 501(c), 505(a), 912(a)(10) (authorizing the creation by publicly traded New York corporations of shareholder rights plans that permit board to discriminate against "interested shareholders" who own 20% or more of company's stock), and there is no caselaw that would enable shareholders to compel Greater New York's board to negotiate with North Fork. See generally William D. Harrington, 44 Syracuse L. Rev. 27, 47-58 (1993) (discussing New York's anti-takeover statutes); William D. Harrington, 42 Syracuse L. Rev. 299, 320-27 (same, commenting that New York's statutes are equivalent of "'Just Say No' defense against an unwanted takeover"). Were New York courts to follow leading precedents from other states, see, e.g., Paramount Communications, Inc. v. Time Inc., 571 A.2d 1140, 1152 (Del. 1990) (holding in favor of board's "defense-motivated" actions against plaintiff Paramount's takeover attempts), it would not require much ingenuity on Greater New York's board or management's part to thwart North Fork's advances, however favorable they might seem to shareholders.
 
 
 37
 At best, therefore, a reasonable shareholder would have foreseen a protracted struggle between North Fork and Greater New York's board, with the latter having a powerful advantage. Any North Fork deal would be perceived as being a marginally possible event of uncertain value in the distant future. The present value of such a deal, discounted by its improbability, would be viewed by a reasonable shareholder as considerably less valuable than the cash-in-hand Astoria deal. There is, therefore, no sense in which the omitted information, if available, would have diminished a reasonable shareholder's favorable view of the merger with Astoria.
 
 
 38
 b) The Sandler O'Neill Opinion
 
 
 39
 Appellants also challenge as materially misleading the proxy statement's incorporation of Sandler O'Neill's fairness opinion, which determined the Astoria merger to be "fair, from a financial point of view." Even assuming for purposes of analysis that, at the time the opinion was proffered, North Fork's offer was higher than Astoria's, the Astoria offer would not necessarily be deemed financially unfair from the perspective of Greater New York's shareholders. See Koppel, 167 F.3d at 134 ("[T]here is no § 14(a) violation for merely failing to inform shareholders that a proposed action is not subjectively the most beneficial to an entity's shareholders . . . ."). The fairness opinion did not purport to suggest that the Astoria merger was the highest potential price for Greater New York but only that the "consideration . . . [was] fair, from a financial point of view." The fairness opinion also stated that Sandler O'Neill had not "solicit[ed] indications of interest in a potential transaction from other third parties other than one third party specifically identified to us by [Greater New York's] Board of Directors," and specifically noted, in bold capitalized letters: "The Sandler O'Neill opinion . . . does not address the underlying business decision of [Greater New York] to engage in the merger and does not constitute a recommendation . . . ."
 
 
 40
 To attack the Sandler O'Neill opinion as materially misleading, therefore, appellants must allege with particularity, Fed. R. Civ. P. 9(b), "provable facts," see Virginia Bankshares, 501 U.S. at 1094, undercutting the statement that the merger was "fair from a financial point of view." An example of such a fact might be that the premium paid by Astoria over historic share price was substantially below that of comparable transactions. Another example of such a fact might be that the merger price did not adequately reflect the present value of expected future free cash flows to the shareholders. No such allegation or showing has been made here. The merger price included a significant premium over historical trading prices for Greater New York's stock. Appellants did allege that the transaction was priced lower than the average banking merger in terms of book value multiple, see Compl. ¶ 57, but such an allegation indicates nothing about the transaction's financial fairness absent allegations of facts suggesting that this ratio differential does not reflect appropriately priced risk variations. And the proxy statement clearly suggests that Greater New York's lower book value premium is explained by above-average risk. The proxy statement reports, inter alia, that the market-value-to-book-value ratio for Greater New York's stock was 1.48 compared to a company mean and median of 1.58; that Greater New York's ratio of nonperforming loans to total loans was 19.69%, compared with a 3.38% mean and 1.52% median for comparable companies; and that Greater New York's ratio of nonperforming assets to total assets was 7.91% compared with a 1.61% mean and 0.86% median for comparables. Thus, appellants have not alleged facts tending to suggest that the Sandler O'Neill opinion was materially misleading in opining that the transaction at issue was financially fair.
 
 
 41
 c) The Recommendation of Greater New York's Board
 
 
 42
 Finally, appellants challenge the recommendation of Greater New York's board that the shareholders approve the Astoria merger. For the most part this challenge overlaps with the alleged omissions concerning North Fork's efforts to negotiate a merger that is discussed in part (a) above. As such, it suffers from the same flaw -- a lack of causal link with the approval of the Astoria merger. To be sure, given the allegations of the complaint, Greater New York's board and Keegan may have deprived the shareholders of an opportunity to select a more profitable (for the shareholders) merger with North Fork and they may have done so to obtain a more profitable deal for themselves. However, knowing that management had a powerful self-interest in rejecting North Fork's advances would not have caused a reasonable shareholder to reject the Astoria deal, for reasons stated in part (a).
 
 
 43
 It may also be that the allegations amount to a breach of fiduciary duties under state law, but such conduct, without an accompanying materially misleading disclosure, does not state a claim under the federal securities laws. See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 479 and 474-80 (1977) (refusing to extend federal securities laws to "overlap and quite possibly interfere with state corporate law"); Koppel, 167 F.3d at 139 (reinstating state law claims because court concluded there was a federal claim to which state law claims could be appended). We also note that appellants have not alleged that the omissions caused them to lose state court rights. See RCM Sec. Fund, Inc. v. Stenton, 928 F.2d 1318, 1327-28 and 1327 n.2 (1991) (explaining interplay between federal and state claims where such claims are "interdependent"). Indeed, given their bringing of a state court action upon announcement of the merger -- an action that can be revived -- no such claim could be made. See Virginia Bankshares, 501 U.S. at 1106-08.
 
 CONCLUSION
 
 44
 The alleged omissions to the proxy statement challenged by appellants cannot establish a claim under Rule 14a-9. Having determined that appellants' federal claim lacks merit, we decline to exercise pendant jurisdiction over their remaining state law claims. We therefore affirm.
 
 
 
 Notes:
 
 
 *
 The Honorable John F. Keenan, of the United States District Court for the Southern District of New York, sitting by designation.
 
 
 [1]
 We do not analyze the sufficiency of appellants' complaint under the pleading standards established by the Private Securities Litigation Reform Act of 1995 (the "Act"), 15 U.S.C. 78u-4(b)(1). We may assume for purposes of this appeal that appellants' pleadings are sufficient under the Act's requirements because the underlying facts cannot establish liability under Rule 14a-9, a conclusion that would not be altered by more detailed pleading.