CITY PARTNERSHIP CO., on behalf of itself and all others similarly situated and derivatively on behalf of American Cable TV Investors V, Ltd. a Colorado limited partnership, Plaintiffs,

v.

LEHMAN BROTHERS, INC., Defendant.

and

American Cable TV investors V, Ltd., a Colorado limited partnership, Nominal Defendant.

No. CIV.A. 99F2122CBS.

United States District Court, D. Colorado.

Oct. 27, 2004.

Jeffrey S. Abraham, Samuel R. Simon, Abraham & Paskowitz, New York, NY, Laura J. Bottaro, Robert F. Hill, Jennifer H. Hunt, Avi Sue Rocklin, John F. Walsh, III, Hill & Robbins, P.C., Denver, CO, for City Partnership Co.

George B. Curtis, Stephen C. McKenna, Jeffrey Eric Oraker, Gibson, Dunn & Crutcher-Colorado, Denver, CO, Juliet Marie Hanna, Greenberg Traurig, LLP-Colorado, Denver, CO, for Lehman Brothers, Inc.

Noel M. Franklin, Sherman & Howard, Denver, CO, Nancy J. Gegenheimer, Donald Iain Junor Kelso, Randall H. Miller, Holme, Roberts & Owen, LLP, Denver, CO, John Michael Roche, Snell & Wilmer, LLP, Denver, CO, Stefan Darrell Stein, Sherman & Howard, Denver, CO, for Tele-Communications, Inc.

Luis Angel Toro, Frank W. Visciano, Senn, Visciano, Kirschenbaum & Merrick, P.C., Denver, CO, for IR-TCI Partners V, L.P.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FIGA, District Judge.

Plaintiff City Partnership Company ("City Partnership") is a limited partner of American Cable TV Investors V, Ltd. ("ACT5"), which formerly owned and operated a cable television system in and around Riverside, California (the "Riverside System"). This action arose out of ACT5's sale of the Riverside System to Century Communications Corporation, subsequently known as Adelphia Communication Corporation ("Century"), a joint venture partner of IR–TCI Partners V, L.P. ("IR–TCI"), TCI Ventures V, Inc. ("TCI5") and Tele–Communications, Inc. ("TCI"), former defendants to this action. (Collectively, the former defendants are

sometimes referred to as the "TCI Defendants.") In order for the sale to be effective under a term sheet between ACT5 and Century, the limited partners of ACT5 had to approve it. To solicit the limited partners' approval, the former defendants distributed a proxy statement with an attached Fairness Opinion as of August 31, 1998 and confirmed on October 16, 1998 (the "Fairness Opinion"). Lehman Brothers, Inc. ("Lehman"), the last remaining defendant in this action, authored the Fairness Opinion pursuant to a December 9, 1996 engagement letter that was extended on April 16, 1998.

Plaintiffs, members of the class and current limited partners of City Partnership, allege that the former defendants intentionally sold the Riverside System for a price ($33,399,000) that was below market value, and obtained limited partner approval of the sale with materially misleading and false statements in the proxy statement and Lehman's Fairness Opinion. Plaintiffs assert that Lehman actively participated in preparing and distributing the proxy statement, which ultimately caused the sale of the Riverside System at the unfairly low price.

On November 2, 1999, plaintiff and class representative City Partnership filed this class action and derivative lawsuit, asserting various claims for relief against the former defendants, including violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78n(a) (1997) and Rule 14a–9, 17 C.F.R. § 240, 14a–9; breach, conspiracy to breach, and aiding and abetting in the breach of the fiduciary duties owed to the limited partners of ACT5; and negligence. The former defendants settled the claims against them and the Court preliminarily approved the settlement on May 18, 2004. The Court certified the class as part of the settlement. The Court held a bench trial on the remaining claims against Lehman (violation of Section 14(a) and aiding and abetting breaches of fiduciary duties committed by the former defendants) between September 27–30, 2004. The Court now makes the following findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a).

## BACKGROUND

The heart of plaintiffs' two remaining claims against Lehman is their contention that Lehman's Fairness Opinion did not account for a surge in the market for television cable systems in 1998 due to the prospect of the availability of increased broadband services to be delivered by cable. Plaintiffs claim that this failure was a result of Lehman's decision not to perform a "discounted cash flow analysis" in its valuation process, instead relying principally upon a comparable sale analysis. Plaintiffs claim that the comparable sale analysis was inadequate standing alone because it was based upon outdated data from fifteen months before the issuance of the Fairness Opinion. Lehman did not disclose in the Fairness Opinion that it had not performed a discounted cash flow analysis or based its comparable sale analysis on "older" data without updating the data to reflect the "surging" bull market. Plaintiffs also assert the Fairness Opinion did not recognize that the Riverside System was itself experiencing rapid financial improvement during the same period. Because Lehman's Fairness Opinion did not account for either of these factors, plaintiffs argue that it devalued the Riverside System by somewhere between $10,101,000 and $13,462,000 (depending on the date upon which damages are calculated). Plaintiffs claim that the fair market value of the Riverside System was actually $43,500,000 on August 31, 1998, the date of the Fairness Opinion, and $46,861,000 on November 6, 1998, the date the proxy materials were sent to the limited partners.

Plaintiffs thus base their damages on the difference between those amounts and the $33,399,000 final adjusted sales price.

Plaintiffs in addition contend that Lehman noted, but failed to take into account and value, the conflict of interest presented by the sale of the Riverside System to a joint venture partner of the former defendants. Plaintiffs argue that Lehman itself too had a conflict of interest in issuing the Fairness Opinion for the Riverside sale because of its longstanding and financially lucrative relationship with the former defendants. As a result, it could not act as an "independent" outside assessor, but instead was beholden to the former defendants to assure that the sale proceeded smoothly and quickly.

The "Timeline of Events for Sale of Riverside System," Exhibit A to Plaintiff's Trial Brief, accurately summarizes key events and is restated along with other essentially undisputed milestone dates as follows:

Fall 1996: ACT5, using the services of Daniels & Associates, L.P., auctioned for sale the Riverside System and three others it owned.

December 9, 1996: ACT5 and Lehman entered into an engagement letter for Lehman to prepare and provide the Fairness Opinion in conjunction with an earlier effort by ACT5 to sell up to four cable television systems, which included the Riverside System. *See* Trial Ex. A, pp. 1–5.

December 9, 1997: TCI, a former defendant in this action, subsequently known as AT & T Broadband, LLC, currently Comcast Cable Holdings, LLC, signed a term sheet to form a joint venture with Century and agreed that Century would use its "best efforts" to purchase the Riverside System.

February 25, 1998: TCI5, also a former defendant in this action and the managing partner of IR–TCI, voted on behalf of ACT5 to accept Century's bid of $33,000,000 to purchase the Riverside System.

April 16, 1998: Lehman's engagement letter with ACT5 is extended for three months. *See* Trial Ex. B.

August 31, 1998: Lehman delivered its Fairness Opinion regarding the Riverside System to IR–TCI, which was acting for ACT5.

October 16, 1998: Lehman made a presentation to the TCI5 Board, which was also acting on behalf of ACT5, concerning its Fairness Opinion.

November 6, 1998: The proxy statement, together with Lehman's Fairness Opinion, was mailed to the ACT5 limited partners.

December 11, 1998: A special meeting of the limited partners was held in which the sale of the Riverside System to Century was approved.

December 7, 1999: The sale of the Riverside System to Century closed for an adjusted price of $33,399,000. On the same day, the TCI/Century joint venture also closed.

TCI is the ultimate parent corporation of IR–TCI and TCI5. TCI5 is the general partner of IR–TCI. IR–TCI is the managing general partner of ACT5. The Court accepts as accurate the organizational chart reflecting the structure of ACT5 and those entities in control of or affiliated with it, Trial Ex. DDD at 4.

This Court previously ruled that Lehman owed no duties to plaintiffs after the December 11, 1998 proxy vote. *See* Order Denying in Part, and Granting in Part, Motion by Defendant Lehman Brothers for Summary Judgment, dated December 17, 2003. As part of the settlement with the former defendants, plaintiffs acknowledged that before Lehman is liable to

plaintiffs for damages "the Court specifically has determined ... that ... Lehman's liability to Plaintiff [City Partnership Co. on behalf of the limited partners], ACT5, the Class and/or the Limited Partners resulted directly from Lehman's gross negligence, bad faith, and/or willful misconduct ...." Plaintiffs further agreed that their collection or execution of or on any judgment against Lehman would be limited to an amount not to exceed $3,750,000 plus the amounts paid by ACT5 to Lehman for its attorneys' fees and other defense costs. *See* excerpt from the March 24, 2004 settlement agreement, attached as Ex. C to Plaintiff's Trial Brief.

## THE ELEMENTS OF THE TWO CAUSES OF ACTION

 To prevail on a claim for violation of Section 14(a) of the Securities Exchange Act of 1934, a plaintiff has the burden of proving by a preponderance of the evidence that (1) there was a material misrepresentation of fact made by the defendant in a proxy statement governed by the Act; (2) the misrepresentation caused injury to the plaintiff; and (3) the proxy solicitation was an essential link in the accomplishment of the transaction. *Mills v. Elec. Auto–Lite Co.*, 396 U.S. 375, 384–85, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). SEC Rule 14–9a, 17 C.F.R. § 240.14a–9(a), prohibits the solicitation of proxy statements "containing any statement which is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." False statements as to opinions or beliefs set forth in proxy solicitations may be actionable under federal securities law as misstatements of material fact. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S.

1083, 1095–96, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). An investment banking firm issuing a fairness opinion that it knows will be used for proxy solicitation and relied on by voting constituents may be deemed engaged in proxy solicitation. *See e.g., Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179 (3d Cir.1988), *cert denied*, 489 U.S. 1054, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989) (investment bank could be held liable under federal securities laws where the investment bank permitted its fairness opinion to be included in proxy solicitation materials, but without a genuine belief or reasonable basis for concluding that the economic assumptions upon which the fairness opinion was based were accurate).

 The parties appear to agree that Colorado substantive law governing aiding and abetting breach of fiduciary duty applies here. The elements of such a cause of action are (1) that ACT5 and its decision-makers, *i.e.* the former defendants, breached a fiduciary duty owed to the plaintiff limited partners; (2) Lehman knowingly participated in that fiduciary duty; and (3) such aiding and abetting of such breach of fiduciary duties by third parties was a cause of plaintiffs' damages. *Nelson v. Elway*, 971 P.2d 245, 249 (Colo. App.1998) citing *Holmes v. Young*, 885 P.2d 305 (Colo.App.1994).

## WHAT IS A FAIRNESS OPINION?

The fairness opinion is a creature of contract, but its contours as set forth in the engagement letter of December 9, 1996 coincide with the general concept of the term in the industry. *See generally*, Note, "Fairness Opinions and Negligent Misrepresentation: Defining Investment Bankers' Duty to Third–Party Shareholders," 60 *Fordham L.Rev.*, 133, 137 (1991):

Fairness opinions are "short letters that state an opinion about whether the consideration in a proposed transaction is 'fair' " to the shareholders from a finan-

cial point of view. An investment banker usually addresses this letter to a special committee of the board of directors, which then publishes it in a proxy statement to all shareholders in accordance with securities law. Investment bankers deem a "fair" price to fall "within a range of prices at which informed parties might strike a deal, but not necessarily the highest obtainable price." In corporate control transactions, valuing the stock that is the subject of the transaction is necessary to determine what price is fair; the fairness opinion is a common vehicle to establish the fairness of a price.

(Footnotes omitted.)

The letter employing Lehman to prepare the Fairness Opinion states at paragraph 1: "The Partnership hereby engages Lehman Bros. to render to the Partnership opinions ... with respect to the fairness, from a financial point of view, to the Partnership of the consideration to be received by the Partnership in the proposed sale ... of up to four separate cable systems." ACT5 agreed to pay Lehman a $100,000 retainer plus an additional fee of $50,000 for each fairness opinion. *Id.* at ¶ 5.

The "fair from a financial point of view" language is well-recognized. *See e.g., Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 497 (5th Cir.2000); *Minzer v. Keegan,* 218 F.3d 144, 151 (2d Cir.2000); *Keach v. U.S. Trust Co., N.A.,* 240 F.Supp.2d 832, 838 (N.D.Ill.2002). Investment bankers will prepare valuations of companies involved in transactions and issue fairness opinions based on the result of such valuations. Giuffra, "Investment Bankers' Fairness Opinions in Corporate Control Transactions," 96 *Yale L.J.* 119, 122 (1986). Like the situation here, "[t]ypically, the investment banker will provide both a short written opinion stating whether the transaction is fair and more detailed

statistical materials for use during the bankers' oral presentation to the board of directors." *Id.*

Fairness opinions help persuade corporate stakeholders such as shareholders or limited partners to approve transactions. Perhaps as importantly, they are used to help directors or similarly situated business decision-makers discharge their fiduciary duties. *See e.g.,* Bebchuk and Kahan, "Fairness Opinions: How Fair Are They and What Can Be Done About It?" 1989 *Duke L.J.* 27, 28 (1989). As the *Duke* article points out, investment banks possess substantial discretion in determining what prices are fair to corporate stakeholders. *Id.* at 29.

## DISCUSSION

Given plaintiffs' stipulation with the settling defendants that the applicable standard for liability as to both causes of action consists of whether Lehman's actions were the result of its gross negligence, bad faith, and/or willful misconduct, no additional analysis derived from examining applicable law is necessary as to the state of mind requirement. Plaintiffs have not attempted to repudiate that liability standard as being operative, and Lehman has relied upon it. The Court therefore accepts and applies it to the facts herein.

The Court finds that Lehman was engaged in proxy solicitation and that its Fairness Opinion and surrounding conduct was an integral part of obtaining approval of the ACT5 limited partners for the Riverside transaction. The December 9, 1996 engagement letter, Trial Ex. 1, requires ACT5's cooperation "in connection with its [Lehman's] financial review and the rendering of its" opinions, and Lehman controlled how its Fairness Opinion would be presented in the proxy materials, although Lehman could not unreasonably withhold its approval. Lehman's actions throughout the proxy solicitation process, particularly in its communications with the set-

tling defendants, show that Lehman did not waive its rights under the engagement letter as extended to control aspects of the proxy statement's contents, particularly those related to references to Lehman and the Fairness Opinion in the proxy materials. By affirmative approval or by simple acquiescence, Lehman approved the representations set forth in the proxy solicitation of November 6, 1998, and did nothing to request additions or changes.

The Court, however, further concludes that plaintiffs fail to meet their burden of proof that Lehman acted with gross negligence, in bad faith or willfully. Absent such a state of mind of Lehman's representatives, plaintiffs' claims must fail.

*Lehman's Conduct*

First and foremost, a fairness opinion reviews a transaction in place. It is not a hypothetical forecast of what a willing buyer might pay to a willing seller for an asset. Here is what Lehman saw:

The asset at issue, a city-wide cable television system covering 19,100 subscribers, remained unsold after an initial auction effort in 1996 by Daniels & Associates, L.P. ("Daniels"), acting as sales agent of the former defendants. *See* Trial Ex. I. After further sales efforts by Daniels in 1998, no new bidders sought to vie for the Riverside System. Century became the sole interested purchaser of the system willing to put serious money on the table. There is no contention that the decision by the TCI Defendants to sell the system was wrong or improper or that Daniels fell

down on the job. The auction and sales efforts themselves appear to cast a wide net for potential purchasers. At least 11 potential buyers who appeared to have the experience and wherewithal to complete such a transaction were provided information packages. The failure to consummate a transaction through the 1996 auction may have depressed the ultimate purchase price in 1998. Moreover, the TCI Defendants appear to have attempted to negotiate the highest price they could. The failure to sell the system at the price agreed upon (or put another way, insistence by the TCI Defendants to sell system at a price closer to what plaintiffs now believe would have been appropriate, *i.e.* over $40,000,000) might have resulted in the system not being sold at all. In that case, to remain competitive, the limited partners of this thinly traded limited partnership might have been asked to come up with another $5–6,000,000 to upgrade and rebuild the system, or at least its operating capacity, from 450 to 750–860 megahertz, something no limited partner had indicated a willingness to do. The record lacks any indication that the partnership itself had operating funds sufficient to undertake material upgrades.

■ While a fairness opinion such as the one under consideration must implicitly if not explicitly factor in to the value of the system what constitutes "fairness, from a financial point of view, to the Partnership," its author is traditionally accorded much leeway in its assessments. Perhaps too much so.[1] *See e.g., Koppel v.*

---

1. A Practicing Law Institute monograph entitled "Functional Fairness–The Mechanics, Functions and Liabilities of Fairness Opinions" (2002) addresses the cynical view of fairness opinions directly:

 "There has been a fairly hefty amount of commentary regarding investment banker fairness opinions, with most of the critical pieces emanating from the mid-eighties to early nineties. On the academic side the

commentary has ranged from suggesting that fairness opinions are simply the conspiratorial output of management and the bankers designed to dupe shareholders, suggesting that fairness opinions may add value but only if the bankers are held, in effect, primarily liable if the opinion turns out to have been inadequately prepared (which, given 20/20 hindsight, no plaintiff's lawyer will have problems alleging) and suggesting that fairness

*4987 Corp.*, 167 F.3d 125, 134 (2d Cir.1999) ("[T]here is no § 14(a) violation for failing to inform shareholders that a proposed action is not subjectively the most beneficial to an entity's shareholders ....."). For example, without the benefit of hindsight, Lehman factored in such things as increasing competition from direct broadcast satellite television (DBSs) and other cable companies, including those with multichannel multipoint distribution systems (also known as MMDS), flat growth, and potential municipality political problems and delays. *See e.g.*, Trial Ex. 33 at LBAV 1100, 1133–1135. In blessing the transaction, the Fairness Opinion may have overestimated the liabilities or disadvantages of the Riverside System or the state of the industry, and undervalued the assets; however, Lehman's observations reveal themselves as conventional and mainstream and, after reviewing all the evidence, appear not so forced or contrived as to cry out for further explanation and justification.

Lehman's actions were consistent with what it saw as its duties under the engagement letter and to the limited partners. It gathered information, financial and otherwise, as it possessed or was provided by ACT5, it processed such information, it did not disregard information it was provided, it held internal meetings to discuss the Fairness Opinion, and it met with representatives of ACT5 to share its results. There is no credible basis for establishing that Lehman engaged in a charade or merely rubber-stamped a predetermined result sought by ACT5. The Court deems credible the testimony of Glenn Schiffman and Marvin Jones as to Lehman's actions and communications with the former defendants. Nothing suggests that Lehman squelched internal dissent or suppressed inconsistent findings. *See generally*, Trial Ex. 33, the 178–page Fairness Opinion and its underlying documentation and analyses. Specifically, there is no indication that Lehman sought to or was encouraged to skew the results of its work or override the desire of anyone to develop data to formulate alternative indications of value. The methodologies employed in the Fairness Opinion were discussed in the proxy statement (Trial Ex. DDD, at 25–28 and Appendix B thereto).

*The Omission of a Discounted Cash Flow Analysis*

█ While the proxy materials did not mention Lehman's failure to consider a discounted cash flow analysis as a value factor, the sophisticated investors for whom an investment in ACT5 would have been appropriate would have been cognizant of such an omission had they conducted more than a superficial review of the materials. While it is a bit troubling that

---

opinions are worthless pieces of paper that add unwarranted and high transaction costs. The other genre of commentary has focused primarily on what standards of liability, if any, should the banker be exposed to shareholders for rendering opinions. As will be discussed later, the courts have been bogged down in a process of examining this liability issue through the lens of antiquated legal theories."

"The academic literature, for the most part, assumes that fairness opinions are the malleable, and valueless, result of collusion between management and the bankers; it goes on to argue that the process should be fixed—either by getting rid of opinions altogether, or creating uniform standards and holding bankers liable. Practitioner commentary, on the other hand, commonly assumes that the degree of professionalism and expertise exhibited by bankers is the antithesis of collusion, and proceeds to argue that bankers should have no liability, other than possibly in cases where there is gross negligence in the process of preparing the opinion—certainly, goes the argument, bankers should not have liability for an honestly expressed opinion."

1316 PLI/Corp at 219 –220 (footnotes omitted).

Lehman's reference to its failure to have conducted a discounted cash flow analysis was mentioned in the Fairness Opinion materials, but not in the proxy statement, to the extent such omission was wrongful the fault belonged to ACT5. Lehman's failure to insist upon rectifying the omission, as it had the right to do, does not constitute gross negligence, wilful misconduct or bad faith. It is far from clear that Lehman even realized that such an omission occurred. Moreover, if the omission had been highlighted in the proxy statement, such a specific reference would not appear to have been material given the lack of such an analysis in any event. While inclusion of such a disclaimer would have been more informative, its absence does not render the proxy statement materially misleading. The Fairness Opinion, Appendix B to the proxy statement, did state that Lehman "did not have access to and was not provided with any forecasts of the future financial performance or results of operations of the Riverside System for any period subsequent to fiscal year 1998 because no such forecasts were available at the time of Lehman Brothers' analysis."

■ Should Lehman have nevertheless conducted a discounted cash flow analysis and disclosed its results? Perhaps so to make the Fairness Opinion a more complete statement of the market value of the Riverside System rather than as an abstract concept. However, an arguably less than ideal or complete valuation analysis does not necessarily constitute a fraudulent or misleading valuation effort. A fairness opinion, based on fairness "from a financial point of view," does not purport to suggest that the sales price is the highest potential price that could be obtained. See Minzer v. Keegan, supra, 218 F.3d at 151. Lehman did not act wrongfully in failing to take that additional step.

Under the terms of the engagement, Lehman was not required to conduct such a valuation, nor was it provided with the financial information necessary for it to conduct one. In other transactional settings such an alternative valuation technique may have been useful for investors to determine whether to vote "yea" or "nay" on a sales proposal before them. However, here Lehman presented credible evidence that a valuation of a large and complex asset such a cable television system could be fairly undertaken without conducting a discounted cash flow analysis. Also, given the longstanding effort and attempts by ACT5 to divest itself from four cable systems, including the Riverside System, and either the unwillingness or inability of ACT5 to make the projections necessary for a discounted cash flow analysis, Lehman did nothing wrong in failing to take upon itself the job of determining market value using that methodology. As noted in Olsen v. Floit, 219 F.3d 655, 658 (7th Cir.2000): "Valuation of closely held businesses is something of a black art. Experts try to project the firm's net cash flow into the future, then discount that stream to present value. This process is difficult for public companies, ... and almost impossible for private companies, for which uncertainties abound." (Citations omitted.) A skilled practitioner can come up with just about any value he or she wants depending upon what is plugged into the variables, particularly the projected growth and discount rates. Here, the TCI Defendants' claimed unavailability of data pertinent to conducting a discounted cash flow analysis reasonably caused Lehman not to demand more information from them.

The Duggan Report, Trial Ex. 41B, and the testimony of Joseph Duggan make the case that the Riverside System was significantly undervalued in the proxy materials. Mr. Duggan claims the system had a market value of between $43,500,000 and $46,861,000 during the August to Novem-

ber 1998 time frame. However, he does not offer a discounted cash flow analysis of his own. Rather, his handiwork attests to a claimed undervaluation of the Riverside System by ACT5 based on comparable sales, some of which occurred after the agreement in principle had been reached with Century. The market for cable systems was hot and prices were moving upward. Yet Lehman presents several persuasive arguments as to why the other sales used by Mr. Duggan are not really comparable given the Riverside System's particularities. For example, the value of MSOs (multiple system operators) may not have the same asset for asset value as a stand alone system such as the Riverside System. Also, Mr. Duggan is not an expert on Fairness Opinions and therefore he cannot attest to whether Lehman's Fairness Opinion itself was improper and deficient. Lehman did have such an expert, Robert Musur, a partner in the valuation services practice of KPMG, LLP., whose testimony the Court finds credible. The results of the February 1998 auction ultimately is the most probative indicator of value at the time. Facts on the ground are far more persuasive than hypothetical constructs. Cable systems are far from fungible for valuation purposes. The Kane Reece Report and the testimony of John Kane of Kane Reece Associates, Inc. offer a credible rebuttal to the Duggan Report as to an appropriate valuation (neither of which existed as of the period when Lehman conducted its work on the Fairness Opinion).

What would a discounted cash flow analysis have revealed in these circumstances with the benefit of hindsight? The record is at best unrevealing on this point. Without a discounted cash flow analysis showing the Fairness Opinion bereft of a fair assessment of the value of the Riverside System, plaintiffs fail in their quest to meet their burden of proof.

*The Rising Value of Cable Systems in the 1998–99 Time Frame*

■ Plaintiffs credibly point to the upsurge in values of cable systems around the time of Century sale, led by AT & T's announced acquisition of TCI and the purchase at a premium price of Charter Communications by Microsoft co-founder Paul Allen. Lehman does not address some of the most contemporaneous sales in the market. However, the abrupt rise in the sales prices of cable systems in the same approximate time period does not mean that Lehman was remiss in failing to account for all of them. The comparable sales Lehman used do not appear to have been selectively chosen with an eye toward manipulating the result. It was far from clear that the higher prices paid for some systems Lehman did not consider were public knowledge, reflected more than a temporary bump or applied to other than MSOs such as a smaller system like the Riverside System. Changes in market values in the 1998–99 time period may not have even been relevant here where the Riverside System had been predetermined to be sold as a matter of grand business strategy two years previously and the consequences of not selling the system would have engendered substantial costs and risks to ACT5 and its limited partners. Again, a fairness opinion is not completely synonymous with a fair market valuation, as it reflects whether the transaction as negotiated fell within a range of financial fairness given the exigencies of the situation. Recognizing that Lehman had no responsibility after the December 11, 1998 vote to update proxy materials, as the December 8, 2003 Order in this case held, the Court finds that no liability based on culpable scienter attaches to Lehman for not analyzing the upward trend of cable system values that began its upsurge before December 11, 1998.

*The Conflicts of Interest*

█ The fact that Century and the TCI defendants were involved in an overarching joint venture deal that subsumed the Riverside transaction does not alter the result. Lehman considered the joint venture and disclosed it in the proxy statement. The asset purchase agreement appears to have been negotiated at arm's length in good faith. There is no indication that there was a potential purchaser in the wings ready to offer a better price or that ACT5 was trying to get less than full value for the system from Century. Also, nothing in the voluminous record indicates that ACT5 discouraged Daniels from receiving additional premium bids, which it was entitled to do until the sale closed under the agreement with Century. The fact that certain conflicts may have existed between Century and decision-makers for ACT5 raises an inference of a motive and possibility of self-dealing by the TCI Defendants, but the fact of self-dealing in the Riverside sale, as opposed to merely its specter, does not materialize in the record. Major players in many industries deal with each other simultaneously both as competitors and collaborators in different situations (oil and gas, high technology and the film industry come to mind). Yet in either context, each player is always seeking to maximize its own position. That, the Court finds, is what Lehman reasonably believed was occurring here between Century and the former defendants, and not at the expense of the limited partners.

Finally, Lehman had its own conflicts of interest, having received sizeable sums from the TCI Defendants for financial services and no doubt expecting future compensation for subsequent work. However, Lehman duly disclosed such potential or actual conflicts of interest in the proxy materials and there is no evidence that Lehman's ongoing relationships with the TCI Defendants affected its work or conclusions in the Fairness Opinion. Again, this is an instance of businesses and professionals intertwined in myriad disclosed relationships, which would not be unexpected in such dynamic industry circumstances, yet there is no special reason to show that Lehman acted with improper scienter in doing what it did.

*Other Factors*

The Court in this ruling has fully considered all of plaintiffs' contentions and evidence. It does not deem any to be significant and credible enough to justify a finding on plaintiffs' behalf as to the ultimate issues on plaintiffs' two claims for relief.

## CONCLUSION

In light of the determinations set forth above, there is no need to address whether the former defendants actually breached any fiduciary duties to plaintiffs (as opposed to what Lehman did and thought it was doing), whether loss causation was established or whether defendant timely designated non-parties at fault. The case is DISMISSED, with Defendant Lehman Brothers, Inc. entitled to its costs. The Clerk of the Court shall enter judgment in accordance with these Findings of Fact and Conclusions of Law.